HOMER H. JOHNSON, APPELLANT, v. RADIO STATION WOW,
INC., ET AL., APPELLEES.

13 N. W. 2d 556

FILED MARCH 10, 1944.   No. 31685.

*Stewart, Stewart & Whitworth* and *Ralph W. Slocum*,
for appellant.

*Brown, Crossman, West, Barton & Fitch, Rainey T. Wells*,

*Paul P. Massey, Peterson & Devoe, Cline, Williams & Wright* and *William P. Kelley, contra.*

Heard before PAINE, CARTER, MESSMORE, YEAGER, CHAPPELL and WENKE, JJ., and ELLIS, District Judge.

WENKE. J.

This action was commenced in the district court for Douglas county by Homer H. Johnson, as plaintiff, on behalf of himself and all other members of the Woodmen of the World Life Insurance Society, against Radio Station WOW, Inc., the Woodmen of the World Life Insurance Society, a corporation, De E. Bradshaw, T. E. Patterson, Farrar Newberry, William Ruess, W. C. Braden, R. E. Miller, Sterling C. Holston, and John J. Gillin, Jr., as defendants, to have the lease and assignment of license by the society of its radio station to Radio Station WOW, Inc., be declared illegal and void and that they be canceled and terminated and that the society be enjoined from transferring by lease, assignment or otherwise radio station WOW or its license thereto and that the officers of the society be required to pay to the society all expenses incurred in connection therewith. From a finding for the defendants and against the plaintiff and dismissing the plaintiff's action and the overruling of plaintiff's motion for a new trial, the plaintiff has appealed.

For the purpose of this appeal the appellant will be referred to as the plaintiff; the defendant Radio Station WOW, Inc., as the lessee; the Woodmen of the World Life Insurance Society, a corporation, as the society; De E. Bradshaw, T. E. Patterson, Farrar Newberry, William Ruess, W. C. Braden, R. E. Miller, and Sterling C. Holston collectively as the officers and directors of the society; and John J. Gillin, Jr., as Gillin.

The first question presented by this appeal is whether the board of directors of the society had the power to authorize the execution of the lease to the radio station. Section 44-1201, Comp. St. 1929, provides in part as follows: "Any such society shall be deemed to have a representative form

of government when it shall provide in its constitution and laws for supreme legislative or governing body composed of representatives elected either by the members, or by delegates elected directly or indirectly by the members, together with such other members as may be prescribed by its constitution and laws: * * * ." Section 1, art. V of the Amended and Substituted Articles of Incorporation, provides: "The Sovereign Camp shall be the supreme representative governing body and shall be composed of its elective officers, members of elective committees, who are ex officio delegates thereto, and such other delegates as are now elected or as shall hereafter be provided for and elected pursuant to the provisions of its Constitution, Laws and By-Laws." Article VI thereof provides in part as follows: · "The Board of Directors shall have the general control and management of the business affairs of this corporation and all matters, except during the sessions of the Sovereign Camp." Section 2 of the Constitution, Laws and By-Laws as amended in 1941 provides: "The Sovereign Camp shall have original and appellate jurisdiction in all matters pertaining to the general welfare of this Society. * * * and shall have generally such powers and may perform such duties as it may deem wise for the welfare of the Society, * * * ." It further provides in section 26 (a) : "All power and authority of the Sovereign Camp, when not in session, shall be vested in the Board of Directors, except as herein provided." And in section 26 (c) : "It shall examine the transactions and reports of its officers and transact any business that cannot be delayed until a meeting of the Sovereign Camp." Article IV of the Amended and Substituted Articles of Incorporation provides: "It may also purchase, erect, equip, furnish, maintain and operate radio stations; * * * ." Section 3 of the Constitution, Laws and By-Laws as amended in 1941 provides: "The objects of this Society shall be * * * own, maintain and operate radio broadcasting stations, * * * ." While it is true, as stated in 2 Fletcher, Cyclopedia Corporations (Perm. ed.) 399, sec. 511: "* * * the directors of a corporation have no authority to make or

authorize contracts or do other acts which are beyond the powers conferred upon the corporation by its charter." However, tested by the provisions of the statute, the Articles of Incorporation and the Constitution, Laws and By-Laws of the society, we determine that the board of directors had the power and authority to enter into and authorize the execution of the 15-year lease of its radio station.

The next question is, should a court of equity modify the lease? After the conclusion of the trial the plaintiff moved to amend the prayer of his petition by including therein conditions for modification of the lease. It is contended by the society, its officers and directors, lessee, and Gillin that this motion was never ruled on and therefore not properly here for consideration. In *Davey v. Aevermann*, 110 Neb. 62, 192 N. W. 956, we held: "This court will not review an alleged ruling of the district court where the record brought to this court fails to disclose that such ruling was, in fact, made by the trial court." The prayer of plaintiff's petition includes the following: " * * * and for such other, further and different relief as equity and justice may require." If we were inclined to consider the question of modification this part of the prayer would be broad enough to permit us to do so. However, as stated in 19 C. J. S. 83, sec. 743: "Within the limits of their authority directors or trustees possess full discretionary power, and in the honest and reasonable exercise of such power they are not subject to control by the stockholders or by the courts at the instance of a stockholder, * * * in the absence of usurpation, of fraud, or of gross negligence, courts of equity will not interfere at the suit of a dissatisfied minority of stockholders, merely to overrule and control the discretion of directors on questions of corporate management, policy, or business." And as stated in *Royal Highlanders v. Wiseman*, 140 Neb. 28, 299 N. W. 459: "The accepted principle is that the wisdom and expediency of corporate business policies and the methods of executing them are left to the discretion and decision of the board of directors. In the absence of usurpation, or fraud, or gross negligence, or transgression of statutory

limitations, courts of equity will not interfere at the suit of dissatisfied stockholders merely to overrule the discretion of directors on questions of corporate management, policy or business." To like effect are *McQuillen v. National Cash Register Co.*, 112 Fed. 2d 877; *Wight v. Heublein,* 238 Fed. 321; *City Bank Farmers Trust Co. v. Hewitt Realty Co.*, 257 N. Y. 62, 177 N. E. 309. Therefore, in the absence of usurpation, fraud, gross negligence or transgression of statutory limitations this court will not interfere with the discretionary powers of directors on questions of corporate management, policy or business.

The next question is, did the officers and directors of the society in making the lease so violate their duties to the society that the lease will have to be canceled? The nature of their relationship is well summarized in *Beaumont v. Folsom,* 136 Neb. 235, 285 N. W. 547: "Directors occupy, of course, a fiduciary relation to the corporation and its stockholders. *Howell v. Poff,* 122 Neb. 793, 241 N. W. 548. They must exercise the utmost good faith in any transaction touching their duties to the corporation and its property. 3 Fletcher, Cyclopedia Corporations (Perm. ed.) sec. 850. Conduct tinged with any breach of faith or inconsistent with any duty will be readily condemned. *Nebraska Power Co. v. Koenig,* 93 Neb. 68, 139 N. W. 839. Dealings with respect to corporate property will be given most careful scrutiny. *Gorder v. Plattsmouth Canning Co.*, 36 Neb. 548, 54 N. W. 830." And as stated in *Whaley v. Matthews,* 134 Neb. 875, 280 N. W. 159: " 'Every violation by a trustee of a duty required of it by law, whether wilful and fraudulent, or done through negligence, or arising through mere oversight or forgetfulness, is a breach of trust.' *First Trust Co. v. Carlsen,* 129 Neb. 118, 261 N. W. 333."

In considering the facts in this case we will, of course, follow the rule as stated in *Ericson v. Nebraska-Iowa Farm Investment Co.,* 134 Neb. 391, 278 N. W. 841: "In the determination of appeals in equity, this court will 'reach an independent conclusion as to what finding or findings are required under the pleadings and all the evidence, without

reference to the conclusion reached in the district court or the fact that there may be some evidence in support thereof.' Comp. St. 1929, sec. 20-1925."

The Woodmen of the World Life Insurance Society is a fraternal insurance society organized in 1891 with its headquarters located in Omaha, Nebraska. At about the time of the lease here involved it had approximately $136,000,000 of assets, $370,000,000 of insurance in force, 335,000 members, and its gross annual income was in the neighborhood of $16,000,000 a year. The members of its board of directors and its officers, who are also members of the board, at the time were De E. Bradshaw, president; T. E. Patterson, vice-president; Farrar Newberry, secretary; William Ruess, chairman of auditors; W. C. Braden, auditor; R. E. Miller, treasurer; Sterling C. Holston, escort; all of Omaha, who are the resident officers and directors named as defendants. Also, H. E. Klugh of Harrisburg, Pa., Robert G. Plunkett of Macon, Ga., William E. Mooney of Chicago, Ill., Charles A. Hines of Greensboro, N. C., Rev. W. M. Crawford of Birmingham, Ala., T. A. Heise of Columbia, S. C., and John J. Wahl of San Antonio, Tex., who are the nonresident members. In 1923 the society obtained a license to operate radio station WOAW which subsequently became station WOW. During the years of 1923 to 1928, inclusive, the station operated at a loss. While a profit is shown for the years of 1929 to 1935, this is discounted by the fact that all charges were not made to the station that properly should have been such as space occupied, salary for time of officers required, wages for time of employees of the society, etc., so that it can be said that up until 1936, when the society changed its location and new equipment was added and a better wave length was obtained with more power, the station operated at a loss. During the years of 1936 to 1942, inclusive, the station made a substantial return to the company. During this time there was charged to it salary for the officers' time used, which in 1942 amounted to $35,000, also for the space occupied which was at the same rate as provided in the lease to lessee. After deducting all

expenses from gross income, including that charged for the officers' time and rent for space occupied, the following net was left from the operation of the station:

| | |
|---|---|
| 1936 | $131,337.34 |
| 1937 | 204,631.31 |
| 1938 | 174,169.14 |
| 1939 | 170,653.57 |
| 1940 | 182,032.52 |
| 1941 | 212,807.38 |
| 1942 | 287,437.74 |

or a yearly average of $194,724.14. The record further discloses that the gross income for January and February of 1943 was in excess of that for the same months in 1942.

While the first evidence of any action with reference to a disposition of the station appears in the minutes of the meeting of the board of directors on October 30, 1937, nothing further appears until the action of March 5, 1942; however, the record does disclose that it was often discussed among the officers and directors. Members of the board gave as some of their reasons for wanting to dispose of the station the following: That the station interfered with the officers in the discharge of their duties to the society which was organized for the purpose of fraternal insurance; the possibility of its (the radio station) income being made subject to income tax; the possibility of its operation causing a tax to be levied on the gross income of the society; the possibility of legislation preventing a fraternal insurance society from owning and operating a radio station; that the society was drawn into controversial subjects discussed over the station; that it caused difficulties in the relationship between employees of the society and the station due to the differences in wage scale; fear of regulatory measures of the Federal Communications Commission destroying the value of the station; because the area covered by the station had been so materially reduced it no longer was of any great value as an advertising medium for the society; because of the additional cost that new developments such as television and frequency modulation would entail; the pos-

sibility of government ownership; and that it had reached the peak of its earning powers and there probably would be a decline in its earning capacity.

On March 5, 1942, the board of directors passed a resolution authorizing the president to negotiate and make a sale of the property for the best price obtainable. Thereafter, on August 25, 1942, President Bradshaw made his report to the board. A committee, consisting of directors Charles A. Hines, William E. Mooney, Robert G. Plunkett, and W. C. Braden, was appointed, who, with all the facts before them which were subsequently put in the lease, made their report to the board favorable to a sale or lease or both and tendered a resolution to that effect. This resolution, after all the facts with reference to the lease were presented to the board, was unanimously adopted and President Bradshaw was authorized to negotiate a sale or lease, or lease and sale subject to the lease, of the radio station, property, and assets other than cash and accounts above $25,000, and he and the secretary were authorized to execute all instruments necessary to carry it into effect. Pursuant thereto the lease on the station and also a lease on the space it occupies were entered into, the terms of which are in accordance with those presented to the special committee and the board. The question of making the lease or sale, or both, was left with President Bradshaw and he handled all the negotiations in reference thereto, William Ruess being the only one present at any of the negotiations.

The lessee is a corporation organized for the purpose of operating the station. Its officers, stockholders, and directors are John J. Gillin, Jr., of Omaha, president and general manager of the station, who owns 100 shares of preferred A, 250 preferred B, and 350 common; Guy C. Myers of Seattle and New York, vice-president, who owns 250 shares of preferred A and 250 common; M. M. Meyers, Omaha, secretary, who owns 50 shares of preferred A and 50 common; Harvey E. Milliken, Omaha, treasurer, who owns 50 shares of preferred A and 50 common; Francis P. Matthews, Omaha, who owns 100 shares of preferred A and

100 common; J. J. Isaacson, Omaha, who owns 50 shares of preferred A and 50 common; Thomas J. Wallace, Chicago, Ill., who owns 100 shares of preferred A and 100 common; Robert P. Samardick, Omaha, who owns 50 shares of preferred A and 50 common. All stock is valued at $1 per share, but preferred A and B has a $7 cumulative dividend right, all preferred being subject to retirement by payment of $100 per share and cumulated dividends. Common was sold at $1 per share, preferred A at $99 per share and 250 shares of preferred B was sold to Gillin at $1 per share. It was authorized to do business when $1,000 was subscribed and paid in. There is no personal liability on the part of the stockholders. The board of directors has the power to determine the working capital and fix or abolish reserves.

The plaintiff charges that lessee is dominated and controlled by men who have been and now are directly or indirectly connected with the Consumers Public Power District of Nebraska, or are personally interested in its acquisition of the power facilities serving Omaha and vicinity, which facilities are now owned and operated by the Nebraska Power Company, and that the obvious purpose of the leasing is to make the radio station available to Consumers and those interested in its acquisition of these facilities. The evidence discloses that Guy C. Myers, vice-president and stockholder of lessee, is a fiscal agent in the field of financing utilities and had handled the acquisition of all utilities purchased by the Consumers Public Power District of some $47,000,000 in value and was negotiating for Consumers in its endeavor to purchase the properties of Nebraska Power Company for which an offer of $40,600,000 had been made; M. M. Meyers, secretary and a director and stockholder of lessee, is a representative of a banking syndicate which had handled all of Consumers' bonds and which hoped to handle the bonds of Consumers if it purchased the property of Nebraska Power Company; Francis P. Matthews, director and stockholder of lessee, is counsel for Consumers in its effort to purchase the properties of Nebraska Power Company; and that John B. Dawson, son-in-law of President Brad-

shaw, is a member of a New York firm of attorneys who are counsel for the banking syndicate that handles all of Consumers' bonds. That these men have an interest in trying to secure the purchase for Consumers is beyond question but there is no evidence that Consumers has any interest in lessee nor have any of the officers and directors of the society any interest in Consumers or lessee nor can Consumers use any of its funds for this purpose. If any of these parties desired time on this station to explain their plan to the public they could purchase it no matter who owns the station and the same amount of time would have to be made available for the other side. It also appears that there is a divergence of opinion among the stockholders of lessee as to the desirability of Consumers acquiring these properties. The record does not sustain this contention of the plaintiff.

The plaintiff further charges that the individual defendants, who are officers of the society, violated their duties as such officers and the trust imposed in them as such by devising a plan to unlawfully procure for the benefit and profit of themselves, their friends and associates the possession and control of radio station WOW for a grossly inadequate consideration. The record discloses that none of the officers and directors of the society have any interest in lessee nor any agreement with any one by which they have now or may in the future claim any interest therein. None of them have any interest in the purchase of the Nebraska Power Company property by Consumers, either directly or indirectly. In their action to dispose of the operation of the station the several directors gave various reasons as controlling their judgment for so doing. All of these reasons are not supported by evidence in the record but the action of leasing the station being within the scope of their authority the reasons therefor and the desirability thereof are matters for their concern and with which the court will not interfere unless their acts are shown to be fraudulent or the terms thereof so inadequate as to create a situation when it must be said that it would be a legal fraud to permit it to stand. Fraud is never presumed but must be es-

tablished by whoever alleges it and in examining the record we fail to find any evidence of actual fraud on the part of the officers and directors of the society.

The next question presented by the record is, do the facts create a legal or constructive fraud? "Constructive or legal fraud may be found from the relation of the parties to a transaction, or from circumstances and surroundings under which it takes place. The conscience is not necessarily affected by it, and it may exist without any fraudulent intent. * * * 'Legal fraud' is synonymous with 'constructive fraud,' and is such as is implied by law from the nature of the transaction itself. The question of the existence or nonexistence of an actual purpose to defraud does not enter as an essential factor in determining the question, but the law regards the transaction as fraudulent *per se." Lake Hiawatha Park Assn. v. Knox County Agricultural Society*, 28 Ohio App. 289, 162 N. E. 653. In *Taxpayers' League v. Wightman*, 139 Neb. 212, 296 N. W. 886, we held: " 'Constructive fraud is a breach of legal or equitable duty which, irrespective of the moral guilt of the fraud-feasor, the law declares fraudulent because of its tendency to deceive others, to violate public or private confidence, or to injure public interests. Neither actual dishonesty of purpose nor intent to deceive is an essential element of constructive fraud.' 26 C. J. 1061." Fraud may be established by circumstantial evidence. "The general rule that fraud is not presumed, but must be proved by the party who alleges it, does not mean that it cannot be otherwise proved than by direct and positive evidence. Fraud in a transaction may be proved by inferences which may reasonably be drawn from intrinsic evidence respecting the transaction itself, such as inadequacy of consideration, or extrinsic circumstances surrounding the transaction. In fact, many of the elements of fraud are such as not to be susceptible of proof by direct testimony. Fraud in its nature is not a thing susceptible of ocular observation or readily demonstrable physically; it must, of necessity, be proved in many cases by inferences from the circumstances shown to have been involved in the

transaction in question." 24 Am. Jur. 89, sec. 257. "Equity courts are said to be more liberal than the law courts in respect of the circumstances from which an inference of fraud may be drawn, and will grant relief upon the ground of fraud established by circumstantial evidence which would not always be deemed sufficient evidence to justify a verdict at law." 24 Am. Jur. 128, sec. 282.

During the past seven years the station has netted the society an average annual income of approximately $194,000 in addition to being charged the same rental for the space occupied in the society's building as provided in the lease with lessee and also being charged with part of the salary of the officers of the society, which in 1942 was $35,000. The net for 1942 was approximately $287,000. The average of the 15-year lease will be approximately $74,000 a year. While the rental income for the space occupied in the building that the society will receive remains the same and it will be assumed that the time given by the officers to the station and now available to other functions of the society will be of sufficient value to compensate for the amount of their salary formerly charged to the station, yet, it is difficult to understand why an agreement would be entered into that would so seriously cut down the income of the society. As an explanation of the difference in the value of the income of the station to the society and the same income to a purchaser or lessee is cited the application of federal income taxes thereto. The income while the station is being operated by the society is tax exempt while generally the income to most any purchaser or lessee would be subject to tax in an amount depending upon the various factors as they would affect such purchaser or lessee. The radio station is a business different from that of the society generally and the matter of the desirability of the society disposing of it being for the board of directors, since it had the power and authority to do so, we will generally not interfere, unless, we come to the conclusion that to permit the action to stand would work a fraud upon the society. The rule as to inadequacy of consideration, taken from 9 C. J. 1174, and

as approved in *Price v. Fraser,* 119 Neb. 806, 231 N. W. 18, is: "Value of property is always a matter of judgment, and a contract based upon inadequate consideration will not be set aside for that reason alone, unless, as the rule is generally stated, the inadequacy is so great as to furnish of itself a convincing evidence of fraud." If the question of inadequacy of income alone were to be the sole guide to our determination in this matter it would be a serious question, whether or not the lease should be set aside, but in determining this question we must carefully analyze the facts leading up to its disposition together with the terms and conditions thereof, for as stated in *McGuire v. Stimbert,* 129 Neb. 383, 261 N. W. 685: "In the determination of the interests of parties, equity looks through the form and regards the substance of the transaction."

The record discloses that President Bradshaw, who was then general counsel for the society, was instrumental in getting the station for the society in 1923. At first the station was financially unsuccessful. President Bradshaw employed Gillin in 1929 and he seemed to have the ability to operate the station successfully and President Bradshaw felt Gillin was largely responsible for the station's remarkable success. Gillin, however, did not at any time become an officer or director of the society. No particular effort was made to dispose of the station by either lease or sale until 1942 although the officers and directors testified that they often discussed it. In 1937 there was some action taken by the board but nothing in particular was done in regard thereto. It is also significant to note that President Bradshaw in his reports to the Sovereign Camp of the Society in 1937, 1939, and 1941 reported favorably upon the radio station and that it was a valuable adjunct to the society and to like effect in his semi-annual reports to the board of directors up until 1942, while in his testimony he stated that it had ceased to be such for the past five or six years. There is evidence that Cowles of Des Moines, Ia., made an offer in 1935 and that the World Herald attempted negotiations in 1936 and 1937 but nothing came of these negotiations.

However, in March of 1942 the board of directors authorized President Bradshaw to negotiate and make a sale of the property for the best price obtainable. The reasons of the various officers and directors for the desired disposition have already been set forth in this opinion.

President Bradshaw first began his negotiations by contacting Trammell of N. B. C. and trying to interest him in having his company carry a second mortgage on the station of $350,000 subject to a first mortgage of $350,000 to the society. This was at first favorably considered and President Bradshaw then contacted Carl A. Swanson and his two sons, Clarke and Gilbert, all of Omaha, endeavoring to sell them the station for $850,000, $150,000 to be a cash payment and the balance to consist of two mortgages as above described. The society was to get the proceeds of the second mortgage. When these negotiations fell through because N. B. C. refused to make the loan a lease was discussed, which was to include an option to purchase. This failed to materialize because of the manner in which federal income tax regulations would affect the income if a lease included an option to purchase. Negotiations then continued with A. Horace Erickson and Clarke Swanson discussing a sale for $850,000. Erickson and Swanson refused to consider this amount but wanted to offer around $600,000-$650,000 but President Bradshaw would not consider anything under $850,000. A lease was then discussed but when Erickson and Swanson wanted the society to pay for new equipment needed for television and also wanted to move the station, this fell through. It is significant that in all these negotiations President Bradshaw wanted the parties to give Gillin a place in the business. Gillin and President Bradshaw had become very close personal friends and as President Bradshaw testified, Johnny (Gillin) had stayed with him and made the station and he did not want to sell it without Johnny being included and have a share in the business and he was willing to do the best he could to see that he got it. There is also evidence that the purchase of the station was considered by the Securities Acceptance

Corporation but dropped, and that the World Herald again made efforts to acquire the station but were turned down until the negotiations hereinafter discussed were completed.

When these negotiations with Swanson and his two sons and then with Erickson and Swanson fell through, President Bradshaw suggested to Gillin that he organize a group of his friends for this purpose and out of these contacts was created Radio Station WOW, Inc., lessee. Among those contacted by President Bradshaw who became officers and stockholders of lessee are Guy C. Myers, Harvey E. Milliken, M. M. Meyers, and J. J. Isaacson. This corporation, the personnel and stock ownership of which has been set out in this opinion, was formed on October 3, 1942, the same day the lease was entered into. Until the very day lessee was incorporated on October 3, 1942, Gillin was only to invest a nominal sum to acquire a one-fourth interest therein of 250 shares of common and 250 shares of preferred B and only when Erickson and Swanson on that date backed down on their agreement to put up $25,000 did Gillin agree to put up $10,000 for which he received 100 shares of common and 100 shares of preferred A. Matthews then put up $5,000 more and Isaacson and Samardick each came in for $5,000, making the $25,000 which Erickson and Swanson were to have put up.

Let us now examine the lease and the provisions thereof. The cash rentals are $8,166 a month for three years and $5,680 a month for 12 years. It is significant to note that the lease requires no down payment, whereas in all previous negotiations President Bradshaw had made a substantial down payment a requirement in addition to the lessee having adequate additional financial stability for the future performance thereof. Not only that, but $25,000 of accounts receivable were transferred by the society to lessee so it would have $100,000 with which to do business which President Bradshaw considered a minimum. Bradshaw explains this by saying he felt Gillin was so essential to the station that if he were left in charge the society would be secure. It is also significant that the amount of accounts

receivable transferred to lessee is equal to the 250 shares of preferred B stock issued to Gillin for $1 per share whereas all the other incorporators of lessee paid $99 per share for their preferred A stock.

One of the principal provisions of the lease for the benefit of the society is that the lessee is to install all new equipment necessary to keep the station in first-class condition and which at the end of the term of the lease is to be turned over to the society. This is considered very important in view of the probability of television and frequency modulation sometime after the war and the probable high cost of such equipment. However, no provision is made in the lease to secure the performance of this part of the lease in the way of reserves by money being kept out of the earnings. The only security is the corporation itself. This expressly provides that none of the stockholders thereof are to be personally liable for its obligations; it also provides that the preferred stock can be redeemed; it can do business on $1,000 capital; its capital structure and reserves are under the control of the board of directors. According to the testimony this new equipment will be very expensive and with the limited funds now available to carry on a business of this kind and with a corporation that can redeem its preferred stock at any time, including Gillin's, there is little security back of this provision except the good intentions of the officers and stockholders of the lessee.

The lease further provides that if the station is taken over by the government then the lessee can turn it back and cancel the lease or pay the rent provided in the lease and keep it in force. This provision only protects the lessee in this very important feature for it can either take a profit or turn the station back to the society without incurring any liability in so doing.

Many of the reasons considered by members of the board as making it desirable to dispose of the station contemplated that the society should completely dispose thereof. This lease does not accomplish this for the society remains the owner. It does not protect the society against legislation

which prevents fraternal societies from owning radio stations. It in no way protects the society if the license to operate is canceled, except for default of lessee, for the lease is then canceled and the society will own the station without a license to operate it. Under the provisions of this lease the society continues to assume the risk of government ownership and the risk of cancellation of the license, which were considered by the directors as important reasons for desiring to dispose of the station.

We have considered the testimony of those witnesses who are experienced in radio and those who are experienced in business matters generally giving their opinion that it was a good deal for the society and that the provisions are adequate, but from our consideration of the entire record we do not agree with their opinions. We find that President Bradshaw, as president of the society and because of his close friendship for Gillin and his desire to secure his future welfare, prompted the organization of lessee by his friends and those of Gillin in order to take over the station. As a result of these negotiations Gillin obtained a one-fourth interest in this 15-year lease on this valuable radio station for a nominal investment and in addition thereto, in effect, a $25,000 bonus from the society. The society in return obtained an extremely excessive reduction in its income therefrom, without a complete disposition thereof, and a lease the terms of which are grossly inadequate to protect it. It is evident, from the record as a whole, that President Bradshaw in his zeal to secure the welfare of his close personal friend Johnny Gillin entered into a lease for the society, which the board of directors authorized, the terms of which are grossly inadequate to protect the society and to permit it to remain in force and effect would be a fraud upon the society and the members thereof. It is therefore ordered that the lease to the station, the lease to the space occupied by the station and the transfer of the license to operate the station be vacated and set aside.

It is further ordered that the $25,000 of accounts turned over by the society to lessee be returned; that an account-

ing be had of the operation of the station by lessee since it took possession thereof on January 14, 1943, and that the income thereof less operating expenses be returned to the society; that the license to operate the station be returned and that lessee is directed to do all things necessary for that purpose; that generally everything be done to restore the parties to their original position prior to the entering into the leases; that the costs of these proceedings be taxed to the defendants, except the Woodmen of the World Life Insurance Society; that all expenses had by the society in connection with the transfer of the station and license to the lessee and that will be had in connection with returning the same to the society pursuant hereto are to be paid by the lessee.

REVERSED, WITH DIRECTIONS.

YEAGER and CHAPPELL, JJ., and ELLIS, District Judge, dissenting.

The majority opinion confirms the power and authority of the directors of the Society to make the lease in question and finds no fault with the decision of the directors that it was to the best interests of the Society and its members for it to get out of the radio broadcasting business.

The opinion finds that there was no actual fraud and otherwise disposes of all the contentions of the plaintiff favorably to the defendants with the exception of the contention that "legal" or constructive fraud is established by the record.

With reference to constructive fraud, this contention, along with all the others made by the plaintiff, involved and placed upon him the burden of proving the same by a preponderance of the evidence.

At the plaintiff's rest there was utterly no proof to sustain any of plaintiff's allegations. If a motion for judgment had been made at that point, it seems wholly improbable that any trial judge would have hesitated to have sustained such motion and entered judgment of dismissal. However, the defendants expressly refrained from entering such a motion, expressly indicated a desire to completely

refute the charges that had been made against them, and then proceeded voluntarily to put in all of the facts and details surrounding the transaction in question.

This attitude on the part of the defendants certainly justifies the inference that they were not conscious of any wrongdoing but rather had a confidence that their action was entirely open and aboveboard and justified by the circumstances.

With reference to the record itself, there is no direct evidence whatsoever that supports any of the plaintiff's charges. On the other hand, the overwhelming weight of the evidence (in nearly all instances uncontradicted) shows the following:

1. The long-held judgment of several members of the board of directors of the Society that the radio station was foreign to and not beneficial to the Society. This judgment was unanimous after 1937.

2. The unquestionable threat of taxation proximately caused by and contributed to by the untaxed profits from the station. This was not a threat based on speculation or conjecture alone but was real in form of legislative proposals and bills and actual suits involving more than $1,000,-000. (This threat of tax legislation proximately caused by or contributed to by the profits from the radio station and prejudice to the primary interest and business of the Society was sufficiently real that if the officers and directors had not been prompted to an effort to eliminate this cause they would have been subject to severe criticism on the ground that they had failed in the discharge of their duties as trustees to the members of the Society.)

3. The peculiar uncertainties, threats and hazards of the broadcasting business.

4. Completely overcomes any inference based on the difference between the income from the Society's operation of the station and the rental under the lease.

5. The return to the Society under the lease appears to be greater than could be realized from outright sale.

6. *Uncontradicted* and overwhelming expert opinion that the rental is adequately compensatory.

7. Completely disproves and overcomes every allegation and insinuation that the officers and directors of the Society had any personal interest in the lessee corporation or stood to profit personally in any way whatsoever from its lease and operation of the station.

In this state of the record the majority opinion is left to rest on just two things—(a) Bradshaw's interest in John Gillin and (b) dissatisfaction with the terms of the lease. With reference to the first, the evidence is overwhelming in establishing Gillin's ability, capacity and standing in the radio field.

When Bradshaw's statements are considered with the context of his testimony, they do not support an inference of ulterior purpose but rather disclose a perfectly normal and proper reason for wanting Gillin to be in any organization taking over the station. There is no evidence that the personal relationship between Bradshaw and Gillin was any other or different than that which would exist between any appreciative employer and a valued, competent and loyal employee. Bradshaw's statements about Gillin should be considered not only in the light of his success in operating the station but also in the light of other facts as, for instance, Cowles's testimony that at one time he attempted to persuade Gillin to leave WOW and enter his employ.

It should also be noted that Carl A. Swanson testified he had known Gillin for a long time and wanted to help him if he could. Also, that Gillin was to have a one-fourth interest in the organization if the Swansons made a deal for the station and that the Swansons were to put up the money.

With reference to the dissatisfaction of the majority with some of the terms of the lease, it is interesting to note that Erickson would have insisted, under a lease arrangement, that the Society pay for the installation of television equipment. And also that the Swansons would not have entered into a lease without an option to buy at the termination of the lease for a nominal sum. This evidence serves to illustrate that no lease is likely to contain only those provisions which are to the advantage of one of the parties.

The advantages of the lease under attack over a lease containing either one or both of the provisions which other prospective lessees would have insisted on is apparent. Under the lease in question the Society continues to own the reversion unincumbered by any option and with assurance that the physical equipment will be maintained and modernized apace with technical developments in the industry, all of which would seem to enhance the opportunity of the Society to sell the reversion and thus entirely remove the Society from the radio business.

In the final analysis it seems apparent that the finding of constructive fraud by the majority must be and is ultimately based upon an inference of inadequacy of the rental consideration reserved in the lease and this inference must rest *solely* on the difference between the amount of net income received by the Society from its operation of the station and the rent it will receive under the lease. This must necessarily be true because all other phases of the matter such as the decision to lease and terms and conditions of the lease are conceded by the majority to fall within the discretion and wisdom of the directors and are not subject to judicial interference in the absence of fraud. It will be noted that the majority opinion holds with reference to the belated motion of plaintiff for alternative relief requiring modification of the terms of the lease that these matters are within the discretion of the directors and that the court will not interfere.

In any comparison of these income figures it must be borne in mind that had it not been for the rare and peculiar exemption of the Society from federal income taxes, the net income of the Society from its operation of the station would have been *very substantially* reduced. It was the advantage of this very exemption over others engaged in the same type of commercial business which aroused prejudice against the general exemption in favor of the Society and other similar institutions and created the threat of legislation to remove the exemption—a threat which at least involved the possibility of injury to the best interests of the

members of this Society far beyond the loss of income represented by the difference between the income from the station operated by the Society and the rental.

The record, as well as common knowledge, overwhelmingly indicates the improbability, if not the utter impossibility, of finding either a buyer or a lessee of the station not subject to the burden of federal taxation. Therefore, in comparing the value of the station to the Society on an income basis with the value that might be realized on a sale or rental under a lease, it seems elementary that consideration must be given to the fact that the station could not be comparably profitable to any available buyer or a lessee and that this inescapable fact would be reflected in any bid or rental offer that might be made.

In this situation the plaintiff, having the burden of proof, *offered no direct evidence whatever* that the rental reserved under the lease attacked was inadequate. Neither did the plaintiff offer any evidence as to the fair market value of this station for whatever help such evidence might be in reasoning from such value to any adequate or fair rental. As before stated, there is nothing in the plaintiff's case to support the inference of inadequate rental consideration and in turn the constructive fraud inferred therefrom except the difference in income.

Against this, the evidence presented by defendants discloses the following: The matter of this lease was referred to a committee of the board of directors of the Society, the members of which met by themselves, considered the matter for two days with all the facts before it and reported to the whole board recommending the lease. Following this, the whole board unanimously approved the lease. The board is composed of 14 members, several of them from scattered points in the United States, and there is nothing in the record that would justify any other assumption than that all members of the board are conscientious, representative and capable men. In addition to the 14 judgments thus represented, three business men of Omaha who are members of the Society expressed their opinion approving the lease.

Messrs. Carl A. Swanson and Gilbert Swanson, who do not appear to have been interested in the Society and who do not appear to have been engaged in the radio business, but who appear to be successful business men and who made some investigation of the business and the federal tax angle as a result of some negotiations looking either to the purchase or lease of the station, testified that in their opinion the rental under the lease was adequate.

In addition to this evidence, the defendants introduced the testimony of six men, all experienced in the ownership, management and operation of radio stations in widely separated parts of the country. Among these witnesses were Niles Trammell, president of the National Broadcasting Company, and Joseph H. Ream, vice-president of Columbia Broadcasting System. All of these witnesses with broad background of experience in a highly specialized and limited field testified that the rental value was adequate. Several expressed the opinion that the rental was not only adequate "but high" and "more than could be secured by rental to other people in the radio industry."

None of the opinions of 25 men thus reflected by the record was impeached in any way and this evidence stands uncontradicted.

In this state of the record we are unable to agree with the conclusion of the majority that the court is justified in inferring constructive fraud.

Recognizing the importance and value of inferences in the determination of disputed facts and that there are many instances in trials where inferences are permitted to overcome positive and direct testimony, we think the latter is only justified where the strength of the inferences clearly overcomes the opposing evidence or where the force of the inference is irresistible and destroys the very credibility of the direct evidence.

Inferences ought to spring directly, naturally and irresistibly from proved facts. In view of the undisputed impact of federal taxes upon the profits of any operator of the station in question other than one enjoying the exemption

of the Society, and the resulting absence of any basis for a rental comparable to the Society's income, it is seriously doubted whether any inference whatever from this difference is justified. The proved fact basis is entirely lacking.

In any event, as stated in 32 C. J. S. 1129, 1133, sec. 1044: "An inference is unjustified and without probative force if it is inconsistent with undisputed or clearly established facts, or is contrary to direct, positive, and uncontradicted testimony. Evidence which is consistent with direct, positive, and otherwise uncontradicted testimony that a fact does not exist will not support an inference that it does, and an inference should not be adopted from a few of the facts proved when it is absolutely inconsistent with, and repelled by, other equally well proved facts."

The result of the majority opinion is to place the problem of disposing of the radio station back in the hands of the directors of the Society with their power to sell or lease confirmed and their judgment that it is to the best interests of the Society to get out of the broadcasting business unquestioned.

This will neither enlarge the field of prospects nor change the character of possible buyers or lessees. Neither will it overcome the inexorable economic fact that any purchase price or rental will be reduced in amount to compensate for the effect upon possible profits of federal taxes. If, to escape judicial condemnation, the purchase price or rental must be directly comparable to the basis of profits to the Society, the directors are faced with great difficulty in executing their judgment if not an absolute bar.

No one can say with positive assurance that this Society will sustain benefit or suffer detriment from the condemnation of the lease in question. Absolute assurance of the wisdom of any major business decision, whether made by an individual or corporate agents, is seldom afforded at the time. Hindsight is all too frequently the unpleasant reminder of mistakes in judgment. The result of the judgment following the majority opinion is essentially a decision of a problem of business or economic character and not

of legal character. It is a venture into a field in which the courts are obviously without adequate experience or equipment. Such decision is easily rendered and will have the virtue of arbitrary finality. This, however, will not exempt it from the inexorable review of time and future developments. It will not be immune from that same hindsight to which all such decisions are subject. Its inherent unsoundness lies in the fact that if time indicates error the maker of the decision is without opportunity or power to move to avoid the consequences. These things are the basis of the rules quoted in the majority opinion from *Royal Highlanders v. Wiseman,* 140 Neb. 28, 299 N. W. 459, and *Price v. Fraser,* 119 Neb. 806, 231 N. W. 18.

The risk that the affirmance of this lease would deprive the members of the Society of a chance of better disposition of this property, if present, is insignificant when compared to the danger to them and all other citizens of the precedent of judicial determination which ignores the overwhelming weight of competent evidence.

We find confirmation of our opinion that the plaintiff wholly failed in sustaining the burden of proof to justify any inference of constructive fraud in the other contention of plaintiff mentioned at the outset. At the close of the case and after the announcement by the trial court that his findings would be against the plaintiff, the latter filed a motion for leave to amend the prayer of his petition. With reference to this the plaintiff says in his brief: "The substance of his proposed amendment was that in the event only that the court determined that the officers and directors of the Society had the right to enter into a lease of the station, the court then require as a condition of its approval, that such lease be modified to protect and safeguard the interests of the Society and its members in certain respects then mentioned." The suggested modifications included a substantial increase in the rental.

This motion seems to clearly disclose recognition by the plaintiff that he had wholly failed to sustain the burden of proof of either actual or constructive fraud and that the di-

rect proof to the contrary was overwhelming. Otherwise the plaintiff has suggested no tenable, legal basis upon which this court could rewrite the lease and bind the lessee thereto.

With reference to Mr. Gillin, his interest in the lessee, and the consideration therefor, he was not an officer of the lessor and what interest he has in the lessee, as well as what he paid for it, seems to be a matter between him and his associates and wholly immaterial to the issues involved. He had been a valuable employee of the Society and the lease of the station left no place for him in the Society. We are reluctant on the record to infer an ulterior purpose from what with equal force appears to have been no more than a decent desire to see him satisfactorily placed. The record gives full credit to him for the successful financial operation of the station by the Society during the later years. The evidence of his ability and valuable contacts in the radio field is overwhelming and undisputed. In view of these facts it seems that Bradshaw's apparent interest in having Gillin in the lessee organization was entirely proper since it directly tended to provide assurance of the success of the lessee and therefore the best possible security for performance of the covenants of the lease.

The escape clauses in the lease in case of the station being taken over by the government or cancellation of the license seem to be no more than sound business provisions which any prudent and experienced business person would insist on with the firm support of his own counsel. It must be borne in mind that the lessee under penalty of forfeiture must keep the station equipment in first class and modern operating condition so that upon its return to the Society in any event the station will be unimpaired from an operating standpoint.

The other provisions of the lease, reflecting in this case as they do in every such instrument the composition of efforts of each party to have as many favorable and as few burdensome ones as possible, cannot, we think, be said to be either so unusual or improvident as to justify any inference of fraud.

It is our opinion that this record wholly fails to disclose any basis justifying the court in disregarding the rule that in the absence of fraud, " * * * the wisdom and expediency of corporate business policies and the methods of executing them are left to the discretion and decision of the board of directors." *Royal Highlanders v. Wiseman,* 140 Neb. 28, 299 N. W. 459.

Heard before PAINE, CARTER, MESSMORE, YEAGER, CHAPPELL and WENKE, JJ.

CARTER, J.

Our first opinion in this case will be found, *ante,* p. 406, 13 N. W. 2d 556. In that opinion we determined that the lease of the radio station, which was the subject matter of the action, was made and procured as the result of constructive fraud. The facts upon which this holding was based are set out in the former opinion and will not be repeated here. The lease was thereupon set aside and directions given ordering the restoration of the property to the Wood-

men of the World Life Insurance Society, the owner and lessor. Motions for a rehearing have been filed which raise certain questions not heretofore presented that are deserving of consideration.

It is urged by the defendants that the issue of constructive fraud was not pleaded and that the holding of the court that the lease should be set aside because of constructive fraud constitutes a fatal variance from the pleadings. The petition meticulously recites the facts and prays for a decree declaring the lease to be illegal and void because of fraud and ordering cancellation and termination of the same, and for such other, further and different relief as equity and justice may require. Neither the words "actual" or "constructive" were used in connection with the charging of fraud in plaintiff's petition. Under our system of Code pleading, a petition is required to contain a statement of the facts constituting the cause of action in ordinary and concise language. Comp. St. 1929, sec. 20-804. Legal conclusions as to the nature of the action are not required and are not considered good pleading. *State ex rel. Johnson v. Wagner,* 139 Neb. 471, 297 N. W. 906. The character of a cause of action is determined by the allegations of fact contained in the petition, unaffected by the conclusions of the pleader. An authoritative text states the rule as follows: "Generally, however, it may be said, that the essential character of the cause of action and the remedy or relief it seeks, as shown by the allegations of the complaint, determine whether a particular action is at law or in equity, unaffected by the conclusions of the pleader or by what the pleader calls it, or the prayer for relief, or the nature of the defense interposed, or new matter stated in the reply, or whether the action is statutory or otherwise." 1 C. J. S. 1152, sec. 54. The prayer of the petition asks for general equitable relief and is not, therefore, so restrictive as to preclude the holding that constructive fraud exists. In *School District No. 70 v. Wood, ante,* p. 241, 13 N. W. 2d 153, we said: "A prayer for general relief in an equity action is as broad as the pleadings and the equitable powers of the court." In

the same case we also said: "A prayer for general relief in an equity action is sufficient to authorize any judgment to which the party is entitled under the pleadings and evidence, even though he may have misconstrued his remedy and prayed specially for lesser relief." A constructive fraud is usually defined as "a breach of duty which, irrespective of moral guilt, the law declares fraudulent because of its tendency to deceive, to violate confidence, or to injure public interests." 37 C. J. S. 211, sec. 2c. Constructive fraud generally arises from a breach of duty arising out of a fiduciary or confidential relationship. An examination of the pleadings and the evidence reveals the correctness of the holding in our former opinion that a constructive fraud was sufficiently pleaded and proved by the evidence. Consequently, the claim of defendants that such a holding constitutes a fatal variance from the pleadings and the evidence is without merit.

Defendants urge that the subject matter of this action is solely within the jurisdiction of the Federal Communications Commission Act, subchapter I to subchapter VI, inclusive, of chapter 5, Title 47, U. S. C. A., and that this court is therefore without jurisdiction to pass upon the issues raised herein. This contention is in part based upon the interpretation placed by them upon that part of our former opinion as follows: "It is therefore ordered that the lease to the station, the lease to the space occupied by the station and the transfer of the license to operate the station be vacated and set aside. * * * that the license to operate the station be returned and that lessee is directed to do all things necessary for that purpose; that generally everything be done to restore the parties to their original position prior to the entering into the leases; * * * ."

We conclude at the outset that the power to license a radio station, or to transfer, assign or annul such a license, is within the exclusive jurisdiction of the Federal Communications Commission. Such a license is a permissive grant of a privilege and creates no vested property right in the licensee. *Federal Communications Commission v. Sanders*

*Bros. Radio Station,* 309 U. S. 470, 60 S. Ct. 693 ; *American Bond & Mtg. Co. v. United States,* 52 Fed. 2d 318. But the right of the Federal Communications Commission to license and to require compliance with the regulations of the commission does not deprive the state courts of jurisdiction to hear and decide all other property rights in a radio station and the rights of parties incident thereto. It is true that the Federal Communications Commission may refuse to approve the reissuance of a license to the Woodmen of the World Life Insurance Society. That is a hazard that every radio station operator must take. It is a matter that does not concern this court and is not involved in the decision of the case now before us. In any event, it leaves the Woodmen of the World Life Insurance Society in no different position than if it were obliged to take the station back under the express terms of the lease. The effect of our former opinion was to vacate the lease of the radio station and to order a return of the property to its former status, the question of the federal license being a question solely for the Federal Communications Commission. Our former opinion should be so construed.

The claim of defendants that the court has no jurisdiction of the subject matter of the action is contrary to the pleadings filed by the defendants in the trial court. In their answers the defendants say : "Defendants further allege that the Federal Communications Commission by virtue of the laws of the United States of America and its rules and regulations made pursuant thereto, has and concedes that it has no jurisdiction over the subject matter of plaintiff's action, except jurisdiction to determine the transfer of the license to operate said radio station * * * ." We think this allegation correctly recites the jurisdiction of the state courts in relation to the jurisdiction of the Federal Communications Commission. Our former opinion, correctly interpreted, we think, states the same conclusion. In any event, the trial court and consequently this court, has no power to set aside or vacate the license of the Federal Communications Commission to operate the radio station, that being a matter ex-

clusively within the granted powers of the commission. *Southern Broadcasting Corporation v. Carlson,* 187 La. 823, 175 So. 587. It was not our understanding that there was any contention to the contrary. Any statements in our former opinion on this subject are therefore to be construed in accordance with this opinion.

The claim that this was an action essentially to annul or set aside an order of the Federal Communications Commission is wholly without merit. It is a representative suit brought by one member of the society on behalf of all to protect the interests of all from loss resulting from a lease of valuable property of the society alleged to have been fraudulently made. The fact that the property involved was used in a licensed business was an incident to the suit only. The answer of the defendants, heretofore quoted, squarely contradicts the position they now endeavor to assume. Their position is unsound on its merits and, in addition thereto, it was eliminated from the case by the pleadings they filed in their own behalf.

Defendants also contend that the former opinion and judgment of this court are void because they contravene section 1 of the Fourteenth Amendment to the Constitution of the United States in that they deprive these defendants of their liberty and property without due process of law and that they deny them the equal protection of the laws. It is also asserted that such opinion and judgment contravene section 3, article I of the Constitution of the State of Nebraska in that they deprive defendants of their liberty and property without due process of law.

These questions were not raised in the lower court. They appear nowhere in the pleadings and are for the first time asserted in the motions for a rehearing after an opinion and judgment were entered. This court has repeatedly held that constitutional questions will not be considered unless raised in the trial court. *Bell v. Niemann,* 127 Neb. 762, 257 N. W. 69; *Howarth v. Becker,* 128 Neb. 580, 259 N. W. 505. It is a fundamental rule that the appellate jurisdiction of this court is limited to a review of the rulings of in-

ferior tribunals duly excepted to at the time and to a correction of those which are found to be erroneous; not the consideration of questions first raised after the case is brought here, except they be those involving jurisdiction. This has been the law since this court was first established and we see no reason for departing from it now. See *Courtnay v. Price*, 12 Neb. 188, 10 N. W. 698.

All other questions raised are properly and adequately disposed of in our former opinion. The former opinion is adhered to and the motion for a rehearing is denied.

YEAGER and CHAPPELL, JJ., dissent.