REINHOLD MAYER, APPELLEE, v. THE HOMESTEAD FIRE INSURANCE COMPANY OF BALTIMORE, MARYLAND, A STOCK CORPORATION, APPELLANT.

35 N. W. 2d 413

Filed December 29, 1948. No. 32422.

*Einar Viren* and *Julius D. Cronin,* for appellant.

*W. L. Brennan, Parnell J. Donohue,* and *T. F. Nolan,* for appellee.

Heard before SIMMONS, C. J., PAINE, CARTER, MESS-MORE, YEAGER, CHAPPELL, and WENKE, JJ.

MESSMORE, J.

This is an action at law to set aside a release and satisfaction of a settlement made for the loss of plaintiff's crops due to a hailstorm under the terms of an insurance policy plaintiff carried with defendant company, on the grounds of fraud and misrepresentation, and to recover on the policy.

On June 21, 1945, the plaintiff and defendant entered into the insurance contract to insure plaintiff's grow-

ing crops against loss or damage that might be caused by hailstorms. The premium was paid. On July 4, 1945, crops belonging to the plaintiff and insured under the policy were damaged by hail. The defendant was notified of a loss to plaintiff's crops. Pursuant to the notice and report of loss, an adjuster for the defendant company contacted the plaintiff for the purpose of adjusting the loss. An adjustment was made and the damage to crops fixed at $843. Proof of loss or release was signed by the plaintiff. A check in accordance therewith was remitted to a bank having a business interest in the matter. The check was not accepted by the plaintiff.

The amended petition of the plaintiff alleged the false and fraudulent representations to be in substance as follows: That the adjuster stated and repeated to the plaintiff that he would see that the plaintiff secured the amount he desired under the insurance policy if the plaintiff would sign certain papers in satisfaction of the loss claimed; that he would see that plaintiff would get the full amount which he claimed, instead of $843; and that by reason of such false, willful, and fraudulent representation on the part of defendant's agent, the plaintiff was induced to sign the proof of loss or release.

The defendant's answer denied fraud or that any false representation was made by its agent to the plaintiff to induce him to sign the proof of loss or release; and that plaintiff voluntarily, of his own free will, without duress, fraud, or promise, executed the proof of loss of the adjustment made with him by the defendant's agent.

The case was submitted to a jury, resulting in a verdict in favor of the plaintiff in the amount of $1,439, the amount prayed for. Upon the overruling of the motion for new trial, defendant appeals.

For convenience, the appellant will be referred to as the defendant, the appellee as the plaintiff.

The defendant predicates error upon the trial court's

not directing a verdict in its favor and submitting the case to the jury. This requires an analysis of the record to ascertain whether or not the trial court was in error, as contended for by defendant.

It appears from the record that the plaintiff is a man of advanced years, has engaged in farming for a period of 30 years, owns and farms a half section, and farms a rented quarter section of land. He has a second-grade education, can read a little, is not able to write much, but can sign his name. His son Clarence, 25 years of age, assists him in his farming and in the transaction of business. The plaintiff has been acquainted with a neighbor by the name of Bentzen for 25 years or more, with whom he has transacted business and upon whom he has relied to write letters for him and transact some business for him.

On Sunday morning July 29, 1945, about 9:30 a. m., defendant's adjuster by the name of Williams, accompanied by another adjuster named Meyer, came to the plaintiff's home for the purpose of adjusting the loss to his crops caused by hail. The plaintiff had no objection to making the adjustment and started with the adjusters in the company car to inspect and look over the damage to the crops. Before starting, the plaintiff requested his son Clarence to go over to Bentzen's place and have him come to plaintiff's farm. The plaintiff accompanied by the adjusters first went to an oatfield consisting of 40 acres southwest of the house, where they drove across the field. Then they went through a pasture to a barley and rye field which they observed for about five minutes. The adjusters said they would allow a loss of 96 percent on the oats and 87 percent on the rye and barley. They then proceeded north to a cornfield of 35 acres where the adjusters went through the field for a short period of time, examining ten rows of corn. The adjusters told the plaintiff the damage to the corn was not sufficient to warrant an allowance. After that the plaintiff and the adjusters returned to

the plaintiff's home to go to the east field, or where there were two cornfields consisting of 81 acres. They stopped at one and walked into the field, and the plaintiff's son and Bentzen arrived. The adjusters examined this corn and estimated that the damage was not sufficient to warrant an allowance to be made. The plaintiff and adjusters then proceeded to the rented land, passed a cornfield, and the adjusters would make no allowance for this corn. They then went to an oatfield of 40 acres, with the plaintiff's son and Bentzen following in another car. After that the plaintiff and the adjusters drove to the north side of the cornfield. The adjusters informed the plaintiff that they would allow 6 percent for the oats, and plaintiff said that was not enough. Bentzen came up with some kernels of oats which he had picked up, and wanted to show them to the adjuster Williams who would not look at them. The adjuster at that time was making a survey of the loss. Bentzen told the plaintiff that if he accepted such a settlement for the loss of the oats he was foolish, and not to sign the paper. The plaintiff's son also told him not to sign the paper. The adjuster got mad and started swearing after Bentzen had asked the adjuster if he was going to pay the plaintiff or cheat him. The adjuster then slammed the door of the car and drove off to the section road where the plaintiff signed the proof of loss or release.

The plaintiff testified the adjuster, Williams, told him that if he would sign the release "that wouldn't be the final end, that the company would make it right with me." He also testified that he did not at any time inform the adjusters that Mr. Bentzen had an interest in the crops or was looking after the matter for him, and that the argument occurred with the adjuster Williams when Bentzen told him not to sign. The plaintiff never asked the adjusters at any time to talk to his son or Bentzen about the adjustment. After he had signed the release, the adjusters told him he would not get any more money than he had signed for. The plaintiff

at no time told the adjusters that he was not satisfied, or that the deal was off, or not to send the money, and the conversation that he seemed to have with reference to not receiving enough money for the loss was after the adjustment was made and was with his son Clarence and Bentzen. At plaintiff's request he was furnished a copy of the percentage of loss showing the adjustment on the crops.

Bentzen testified that the plaintiff introduced him to Williams and told Williams that he was to help adjust the loss, to which Williams assented; that an argument did occur when he wanted Williams to look at some oats, and when he made a statement to Williams to the effect of asking him if he was going to cheat the plaintiff. Williams then got mad and said no one could call him a cheat, and his fists went up. There is no evidence of any blows being struck, and no evidence of anything further in this respect, except that Williams slammed the door of the car and, with the plaintiff, went out on the section road and consummated the settlement. Bentzen wanted to talk to the plaintiff and Williams told him he could talk to him in the road, and then it developed again that the adjuster told him he was taking the plaintiff home and he could talk to him at the house.

Bentzen further testified that the adjuster told him that he was not the person designated as the insured. Bentzen agreed to that, and by his testimony indicated that he had no particular interest in the matter, did not participate in the adjustment in any manner, and had no conversation with reference to the amount of the loss except as heretofore indicated.

The adjuster Williams testified that he had been adjusting insurance for 26 years; and that Bentzen insisted on confusing him when he was figuring out the work sheet while sitting in the company car. He told Bentzen that his name was not on the policy; that the man whose name was on the policy was sitting beside him and he started to make up the work sheet; and

that the plaintiff never told him, or Bentzen, that Bentzen was to help make the adjustment. He asked Bentzen to refrain from interfering. Bentzen said he had a right to, so Williams closed the door of the car and drove out to the highway. Bentzen told Williams he wanted to see the plaintiff. He told him he could see him out at the road, or he could see him at home, because he was going to take him home. He further testified that no complaint was made by the plaintiff with reference to the adjustment at any time after he had signed the proof of loss or release, and that he did not make any statement to the plaintiff that he would get more money if he would sign such papers.

The testimony of the adjuster was substantially corroborated by the other adjuster who accompanied him.

There is some intimation that the adjusters were in a hurry and did not make a proper inspection of the damage to the crops. There is much detailed evidence in the record with reference to the manner of inspecting, and the qualifications of the adjusters to inspect damage to crops.

The plaintiff and those testifying in his behalf were, at most, guessing at the damage to the crops and expressing an opinion as to what they thought the damage should be, without very much investigation or inspection. The plaintiff thought that he had 100 percent damage to his crops.

The adjuster Meyer was examined in detail as to the manner in which inspection of crops is made and what should be taken into consideration with reference thereto in assessing the loss.

There is some intimation in the record that the plaintiff, on the morning prior to the arrival of the adjusters, consumed some intoxicating liquor. However; there is nothing in the record to disclose that when he was transacting business with the adjusters he was under the influence of intoxicating liquor in any degree.

The foregoing is a résumé of the evidence upon which the court submitted the case to the jury.

The defendant moved for a directed verdict at the close of the plaintiff's evidence and at the close of all of the evidence. "A motion for a directed verdict must for the purpose of decision thereon be treated as an admission of the truth of all material and relevant evidence submitted on behalf of the party against whom the motion is directed." Spaulding v. Howard, 148 Neb. 496, 27 N. W. 2d 832.

This court is committed to the following rule in cases such as the case at bar, with reference to fraud and false representation and the proof required.

"To maintain an action for damages for false representation the plaintiff must allege and must prove what representation was made; that it was false and so known to be by the defendant charged with making it, or else was made without knowledge as a positive statement of known fact; that the plaintiff believed the representation to be true; and that he relied on and acted upon it, and was thereby injured." Campbell v. C & C Motor Co., 146 Neb. 721, 21 N. W. 2d 427. See, also, Falkner v. Sacks Bros., 149 Neb. 121, 30 N. W. 2d 572, and cases too numerous to cite.

"Fraud is never presumed but must be proved by a preponderance of the evidence by the person alleging it, and upon failure to so prove the party alleging fraud fails." Bauer v. Wood, 144 Neb. 14, 12 N. W. 2d 118. See, also, Ralston Purina Co. v. Cox, 141 Neb. 432, 3 N. W. 2d 748; Foley v. Holtry, 43 Neb. 133, 61 N. W. 120; Fritsche v. Turner, 133 Neb. 633, 276 N. W. 403; Saffer v. Saffer, 133 Neb. 528, 274 N. W. 479.

It is true, as stated in Johnson v. Radio Station WOW, 144 Neb. 406, 13 N. W. 2d 556: " 'The general rule that fraud is not presumed, but must be proved by the party who alleges it, does not mean that it cannot be otherwise proved than by direct and positive evidence. Fraud in a transaction may be proved by inferences which

may reasonably be drawn from intrinsic evidence respecting the transaction itself, such as inadequacy of consideration, or extrinsic circumstances surrounding the transaction. In fact, many of the elements of fraud are such as not to be susceptible of proof by direct testimony. Fraud-in its nature is not a thing susceptible of ocular observation or readily demonstrable physically; it must, of necessity, be proved in many cases by inferences from the circumstances shown to have been involved in the transaction in question.' 24 Am. Jur. 89, sec. 257." See, also, Rettinger v. Pierpont, 145 Neb. 161, 15 N. W. 2d 393.

In addition to the foregoing cited cases and considering fraud and false representation, the following authorities are applicable to the case at bar, in the light of the evidence.

"* * * fraud will not be imputed where circumstances and facts upon which it is based may be consistent with honesty of purpose." In re Estate of Sheerer, 137 Neb. 374, 289 N. W. 529.

"Evidence simply justifying a suspicion is not sufficient. * * * In the absence of evidence to the contrary, honest and fair dealing in all transactions are to be presumed; and if any person claims that there was fraud in any transaction, it devolves upon such person to prove the fraud, and it does not devolve upon the party charged with committing the fraud to prove that the transaction was honest." Bank of Commerce of Grand Island v. Schlotfeldt, 40 Neb. 212, 58 N. W. 727. See, also, Long Bros. v. West & Co., 31 Kan. 298, 1 P. 545.

We find that in the instant case there are no suspicious circumstances which indicate that the adjustment made by defendant's agents was false or fraudulent. The witness Bentzen was not known to the adjusters to be an authorized agent of the plaintiff to participate in determining the loss in plaintiff's behalf, and in fact did not so participate in such manner.

It is apparent from what has been previously set out

that the parties proceeded to trial and tried the case on the theory as disclosed by the pleadings. In this connection, the parties will be restricted in this court to the same theory upon which the case was prosecuted or defended in the trial court. See Bronnenkant v. Kucera, 141 Neb. 408, 3 N. W. 2d 913. Also, it is said in Kimball v. Lincoln Theatre Corporation, 129 Neb. 446, 261 N. W. 842: "The theory adopted at the trial by the parties and the court, as to the issues, will be followed on appeal."

We conclude that for the reasons heretofore given, the trial court should have sustained the defendant's motion for directed verdict, and dismissed the plaintiff's amended petition. In view of our holding, other errors claimed by the defendant need not be considered.

REVERSED AND DISMISSED.