# WALKER et al. v. BALES et ux.—197 S. W. (2d) 401.

En Banc.  July 31, 1946.

Court of Appeals of Tennessee, en Banc.  July 31, 1946.

Petition for Certiorari denied by Supreme Court, October 5, 1946.

Thurman Ailor and Wayne Parkey, both of Knoxville, for appellants.

Grimm & Tapp, of Knoxville, for appellees.

ANDERSON, P. J.  The bill in this cause was filed by the heirs at law of P. H. Walker, deceased, against the defendants, J. R. Bales and Bernice Bales, to set aside a deed on the ground of fraud in its procurement and failure of consideration. The chancellor granted the relief sought and the defendants appealed.

The challenged deed was executed on March 16, 1943. It purports to convey to the defendants, J. R. Bales and

his wife Bernice Bales, certain farm land in Knox County.

Material parts of the chancellor's finding of fact are as follows:

"On or about March 16th, 1943 J. R. Bales, who was no relation to P. H. Walker, took P. H. Walker to Knoxville in his car and left him in the car in a parking lot and procured a lawyer to write a deed from P. H. Walker, conveying to J. R. Bales and his wife, a farm in the 15th Civil District of Knox County, Tennessee, the deed providing that J. R. Bales and his wife were to 'care for, wait on, provide the ordinary necessities of, the said P. H. Walker for the remainder of his life, he now being infirm and advanced in age; pay his doctor bills and pay the expenses of his funeral after his death, giving him a burial in keeping with his station; to all of which said second parties agree; this deed is delivered in escrow to Ferd Hesler, to be delivered in turn by him to said second parts, upon the latter's furnishing proof of the death of the said first party and that they have reasonably fulfilled this agreement."

"P. H. Walker died on September 19th, 1943, six months and three days after the deed was executed. On September 22nd, 1943 Fred Hessler delivered the deed to the defendants, Bales, who thereupon placed it of record.

"The proof shows that on March 16th, 1943, when the deed was written, the farm this conveyed was worth approximately Thirty-Five hundred ($3500.00) Dollars. The Court finds that P. H. Walker, who was then sixty-six (66) years of age was in feeble health, having had one stroke, and was not capable of safe-guarding his rights in the premises. The proof shows that at the time the deed was executed, the attorney suggested that a

brother of P. H. Walker be named as escrow agent to hold this deed and that the defendant Bales objected to that and insisted on another who was no relation to Mr. Walker, and who apparently was friendly with Bales. In any event, the escrow agent, three days after Mr. Walker died, endorsed on the deed that satisfactory proof had been made to him that the services had been rendered and the debts paid and he delivered the deed to the defendant Bales. Taking into consideration the condition of Mr. Walker's health when the deed was made and the method used by the defendants Bales to get possession of his farm, renders this transaction unconscionable in its nature. The value of the farm is so far in excess of the debts paid and the services rendered as to shock the conscience of a court of equity.

"The court is of the opinion that this deed should be set aside; the property sold to pay the debts of the estate, including a reasonable compensation to the defendant Bales and his wife for the services thus rendered to the deceased Walker. In the event the parties are not able to agree on the amount, further proof may be taken on that question."

The first insistence is that the right to support being personal to the grantor, the suit for cancellation cannot be maintained by his heirs. For this we are cited to Carney v. Carney, 138 Tenn. 647, 200 S. W. 517. The case is not in point. There the Court was considering a provision for support and maintenance which was made a covenant in a deed to real property. It was held that in such case upon default of the promisee, the remedy is not by way of cancellation or revision but a suit for breach of the covenant. See also, Trice v. McGill, 158 Tenn. 394, 13 S. W. (2d) 49.

■ It was recognized, however, that a provision for support may be so framed as to make compliance a condition and that is the case before us. Clearly the parties intended the deed to be effective only on substantial performance of the specified conditions. This being true, equity has jurisdiction to determine whether there has been a compliance in the required manner. See 30 C. J. S., Escrows, Sec. 10, p. 1208, and compare: Parrott v. Parrott, 48 Tenn. 681.

The remaining question is whether the evidence preponderates against the conclusions of fact reached by the chancellor. We think it does.

At the time of his death, P. H. Walker was about sixty-six years of age. He resided on the property here in question. So far as appears, he was unmarried and had no immediate family. About 1939 he had a cerebral hemorrhage, which resulted in his inability to at times control the movement of his bowels and the action of his kidneys. He continued to reside on the farm, renting it to tenants, some of whom seem to have lived in the house with him, and others in a tenant house across the road. Notwithstanding his physical condition Walker was able to and did continue to attend to such business affairs as was necessary in the operation of the farm.

However, his affliction, and especially his inability to control his bowels, made it necessary for him to have some care and attention from others. He frequently soiled his clothing and his bed; and at times had to be bathed and his clothes changed several times a day. Because of his plight, he had for some time prior to the execution of the deed here involved, endeavored to make a contract similar to that made with the defendant, Bales. Others approached about the matter declined to consider it because of the fear that after Walker's death

the transaction would be challenged in court by his brother, the complainant J. C. Walker.

When the deed was executed, Bales was living as a tenant on a farm located about a mile and a half from Walker's home. A short time before, the family who had been living in the house with Walker had moved away because, due to his inability to control his bowels, taking care of him had become too onerous. When this family moved, Walker was left alone in the house. About that time, Walker proposed to Bales the deal subsequently consummated by the execution of the deed. Bales accepted and Walker directed him to go to Knoxville to see Mr. Frank Williams, a member of the bar of that city, and have him come out to Walker's place, apparently with the idea of having the necessary papers drawn. Bales did go to see Mr. Williams, gave him Walker's message, explaining the latter's inability to come to the office due to his physical condition. Mr. Williams was too busy to leave his office and go to Walker's home as requested, and accordingly told Bales to bring Walker to a parking lot in front of the office where he could discuss the matter with him. Bales did this and Mr. Williams held the conference with him as arranged.

Mr. Williams, whose deposition was taken by the complainants, was not sure whether he conferred with Walker before the deed was executed or whether he obtained from Bales the information with respect to the agreement. But this, we think, immaterial. The undisputed evidence is that upon learning of the agreement, Mr. Williams prepared the deed as an escrow, took it to the parking lot where Walker was seated in the car, explained its provisions to him, whereupon Walker "said it was all right." The attorney's fee was paid by Bales

and the deed was left with him and later delivered to Hessler, the depositary named therein.

Thenceforth, Bales had his sons, the eldest of whom was sixteen, to stay with Walker at night, and later employed a man to do this. Bales himself visited him regularly and so far as appears gave him whatever attention was necessary. For a time following the agreement, Walker's meals were furnished directly by Bales. Later he made a contract with one Kelso to furnish Walker's meals. Kelso and his family lived in a tenant house across the road from the house in which Walker lived.

Kelso's deposition was taken by the complainants. He testified that he and his wife supplied Walker with the necessary food but he undertook to deny that this was pursuant to any arrangement with Bales. Kelso and his wife were so far discredited by cross-examination that we are unable to give credit to their testimony upon this point. They virtually admit that Bales did employ them to prepare Walker's meals. They say that Bales was to furnish the food, which he failed to do in sufficient quantities and that they were obliged to make up the deficit from their own supplies. They admit however that Bales did furnish them some supplies to be used in preparing meals for Walker. Why Bales would have been furnishing to Kelso any supplies at all if he had no contract with them to feed Walker is not explained. The only theory consistent with the admitted facts is that Bales did have such a contract with Kelso and that the meals were prepared by the latter pursuant to its terms.

In June, 1943, Walker's condition became such that it was necessary for him to go to a hospital, where he remained for several days. Bales arranged this, took him to the hospital and paid the hospital and doctors' bills. He performed a similar service in September, 1943, when

Walker had another stroke, which proved fatal. He also arranged for his funeral, paid for the digging of the grave and the casket.

Throughout the time that Bales was rendering the services required by his contract, the deceased was visited at intervals by his brother, the complainant J. C. Walker. He was also visited two or three times by the complainant, Georgia Chambers, his niece. So far as appears, none of the other complainants paid any attention to him. The complainant J. C. Walker knew about the execution of the deed, the purpose of it, and circumstances which induced it. He knew that the services were being rendered by Bales under the contract with his brother. He made no complaint whatever as to the manner in which Bales was performing his obligation. Upon the contrary, he stood by, allowing Bales to pay all of the expenses and provide such care as deceased received, and so far as appears, neither rendered or offered to render any service of any kind to his brother, with the exception that he does seem to have furnished him with a suit of clothes on one occasion. The same thing is substantially true with respect to the niece, Georgia Chambers. She seems to have been entirely satisfied with the care and attention being given to the deceased. Her contribution to his welfare was limited to a jar of preserves and an offer to take him into her home, which Walker declined. Moreover, there is nothing to indicate that the deceased himself had any complaint about the manner in which Bales was performing his obligation under the agreement. Upon the contrary, there was testimony to the effect that he was satisfied.

As to the circumstances attending the execution of the deed, we find it impossible to conclude that any advantage whatever was taken of the deceased. Upon the con-

trary, he acted upon the advice of counsel or his own choosing. Mr. Williams was virtually a stranger to Bales, and had never represented him in any transaction. Upon the other hand, he was a friend of the deceased, having known him from boyhood and having represented the family in some legal matters. Mr. Williams testified that ·he was satisfied that Walker chose him to handle the matter because he had confidence in him.

Moreover, the idea of handling the transaction as an escrow apparently originated with Mr. Williams and was obviously for the protection of Walker, thus indicating whom Mr. Williams was representing and that he fully realized his responsibility.

Much is said on behalf of the complainants about the fact that Mr. Williams suggested the complainant, J. C. Walker, as a depositary of the deed and Bales objected. We are unable to attach any significance to this fact. Upon the other hand, we think it natural that Bales would not have agreed to the complainant Walker acting in the capacity of a depositary since, as a potential heir, he was directly and adversely interested. So far as appears, the depositary agreed upon was a disinterested party, impartial and entirely satisfactory to the deceased, as well as to Bales.

It may be true that following his first cerebral hemorrhage the deceased was not as mentally alert as he had been theretofore; but there is no evidence in the record that he was mentally incompetent to understand a business transaction; nor is there any such charge in the bill. Upon the other hand, the evidence without substantial dispute is that for the several years between the time he had his first stroke and the one that proved fatal, the deceased, without aid or advice from his brother or anyone else, transacted without disadvantage the business

necessary in connection with the renting and operation of his farm.

It follows from what has been said that we are unable to conclude that there was anything unconscionable in the nature of the transaction. It is true that the deceased's physical condition at the time was distressing and he was badly in need of care and attention; but it is equally certain that at least two of the complainants were fully aware of the situation and took no steps whatever to remedy it. So far as appears the only way by which the deceased could obtain the necessary care was the method to which he resorted. To say that, being mentally competent, one in Walker's plight, whose relatives do not see fit to care for him, cannot use his own property for the purpose of providing himself with the necessary attention, would hardly be consistent with either law or equity. That a stranger in blood, having assumed the burden and the hazards involved in the uncertainty of life, makes a substantial profit is no valid objection.

The remaining ground of the chancellor's decision is that "the value of the farm is so far in excess of the debts paid and the service rendered as to shock the conscience of a court of equity." We are likewise unable to concur in this conclusion. In the first place there is no evidence in the record as to the value of the services rendered by Bales. At least one witness testified that he would not have taken care of Walker for the farm, because his inability to control his bowels made the task of attending him too burdensome and disagreeable. But apart from this, we think the chancellor's view was erroneous. Because of the inherent nature of the agreement, involving, as it did, the uncertainty of life, the ordinary standard for testing the adequacy of the consideration to support a transfer of property cannot be

applied in a case of this kind. The matter is not to be viewed with hindsight, but considered from the viewpoint of the parties at the time. Subsequent events, such as the early death of the person to be cared for, cannot be used to determine the fairness of the contract or the adequacy of the consideration. Considerable weight must be given the fact that the immediate parties were satisfied with the terms of the agreement. Dingler v. Ritzius, 42 Idaho 614, 247 P. 10, 49 A. L. R. 598, and note.

This is the rule in connection with the remedy of specific performance of such contracts and is no less applicable where the relief sought is that here prayed for.

The result is that the decree of the chancellor is reversed and the bill dismissed insofar as it seeks to have the deed set aside. The cause is remanded to the chancery court for further proceedings in the administration of the estate, jurisdiction of that matter having been transferred from the county court. The cost of the cause, including the cost of the appeal, will be paid by the complainants.

McAmis, Hale, Burnett, Ketchum, Baptist, Felts, Howell and Hickerson, JJ., concur.