WILLIAM F. DALTON, ADMINISTRATOR OF THE ESTATE OF SCOTT G. CASTETTER, DECEASED, ET AL., APPELLANTS, V. FLORENCE HOME FOR THE AGED, A CORPORATION, APPELLEE.

49 N. W. 2d 595

Filed October 25, 1951. No. 32982.

*Hotz & Hotz,* for appellants.

*Wells, Martin & Lane,* for appellee.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

WENKE, J.

William F. Dalton, as administrator of the estate of Scott G. Castetter, deceased, and Margaret Vincent Pullen and Frances Vincent Hall, nieces and sole heirs of the deceased, brought this action in the district court for Douglas County against the Florence Home for the Aged, a non-profit corporation operating a home for aged people. By their action plaintiffs ask for an accounting by the defendant of its financial dealings with Scott G. Castetter, deceased, and seek to have returned to them any balance owing by the defendant of $13,354 paid by the deceased to it for a life membership contract in its home and to recover four shares of American Telephone and Telegraph Company stock. The trial court found generally for the defendant and dismissed plaintiffs' action. Plaintiffs thereupon filed a motion for new trial and have appealed from the overruling thereof.

The appellee is a non-profit, charitable corporation organized under the laws of the State of Nebraska and operates a home in Omaha, Nebraska, for aged people of both sexes. For convenience we will herein refer to it as the Home. Scott G. Castetter, deceased, whose

dealings with the Home during his lifetime are herein involved will be referred to as the deceased.

On January 6, 1948, the deceased made an application to the Home asking that he be received as a life member. Pursuant thereto, and after he had visited the Home in February 1948, he entered the Home on March 3, 1948. The Home had a rule requiring every applicant for life membership to live in the Home for a trial or probation period of two months. It also required that such applicant be examined by its doctor before the application could be finally acted upon. This examination was made on April 1, 1948, by Dr. Charles M. Murphy who was employed by the Home for that purpose. He made a report recommending the deceased as satisfactory. Thereafter, after deceased had been in the Home two months and his application had been approved by the trustees of the Home, a contract for life membership was entered into on May 15, 1948.

The consideration for this life membership was $13,354. It was based on a charge of $900 a year for the life expectancy of the deceased. The deceased was given credit for the $180 he had paid for the two months he had been in the Home on trial. This contract provided that the Home would receive the deceased and provide him "with proper food, lodging, care and the usual nursing and medical attention furnished at the 'HOME' during the period of the 'MEMBER'S' life, in room with running water." Deceased continued to live in the Home until October 4, 1948. He died on that day.

That public policy does not forbid the purchase of an annuity does not need citation of authority. By the payment of a sum in gross the annuitant obtains a certain sum of money annually as long as he lives. There is no difference in principle between receiving a sum of money annually for life and that of receiving a home, including board and room, for life. The adequacy of the consideration is determined at the time the contract is made.

Appellants make no contention that the Home acted fraudulently, that it attempted to take unfair advantage of deceased, or that deceased was unable to understand the terms of the contract. In fact, the record discloses that deceased fully understood the terms of the contract and that he was at all times, up to the very time of his death, pleased with the arrangements he had made and happy in his new home.

However, appellants contend that this court, under its equity powers, should, under the circumstances here disclosed, adjust the payment made by deceased to the Home so as to avoid unconscionable results and prevent an unjust enrichment of the Home. In support of this contention it relies on the following principles:

"Distinction exists as between an ordinary commercial contract and a contract of the kind here considered. Contracts of the latter class are in a different classification and not subject to the ordinary rules applied by courts in other cases. Anderson v. Reed, 20 N. M. 202, 148 Pac. 502, L. R. A. 1916B, 862." Copass v. Wilborn, 139 Neb. 124, 296 N. W. 565. See Whitney v. Combe, 151 Neb. 401, 37 N. W. 2d 613.

"Constructive fraud, a term applied to a great variety of transactions which equity regards as wrongful and to which it attaches the same or similar effects as those that follow actual fraud, has been evolved to designate what is essentially nothing more than the receipt and retention of unmerited benefits. Constructive trusts arise by operation of law to prevent injustice; fraud, active or constructive, is their essential element, and they will arise whenever it becomes necessary to prevent a failure of justice. Equity will construct a trust where a person gains something he should not be permitted to hold in equity and good conscience through actual fraud, abuse of confidence, or questionable means. A constructive trust arises not from agreement but from operation of equities in order to satisfy demands of justice. A court of equity, in decreeing a constructive

trust, is bound by no unyielding formula as the equity of the transaction must shape the measure of relief. A constructive trust is imposed not because of the intention of the parties but because the person holding the title to the property would profit by a wrong or would be unjustly enriched if he were permitted to keep the property. Constructive trusts are such as are raised by equity in respect of property which has been acquired by fraud, or where, though acquired without fraud, it is against equity that it should be retained by him who holds it." Olitkowski v. St. Casimir's Savings & Loan Assn., 302 Mich. 303, 4 N. W. 2d 664. See, Johnson v. Radio Station WOW, 144 Neb. 406, 13 N. W. 2d 556; Restatement, Restitution, § 160, p. 640.

In order to dispose of this contention we shall set out somewhat in detail the facts disclosed by the record as they relate thereto. Deceased was born on November 19, 1886. Either he was born with curvature of the spine or became afflicted with it in his early youth. This affliction caused him to become a pronounced hunchback with a protruding chest and resulted in his remaining small in stature and light in weight. His greatest height is shown as 4 feet 5¼ inches and his heaviest weight as 80 pounds. It also caused him to have difficulty in breathing, particularly when he exerted himself. Little is shown of his early life. He apparently lived with his parents. For some years prior to 1942 they lived in Blair, Nebraska. During his life, but prior to 1942, deceased held various jobs, such as working in a bank, bookkeeper in a store, and selling bus tickets. His condition did not permit him to perform any arduous labors.

The Castetter family consisted of the parents, deceased, and one sister, Hallie Castetter Vincent. The sister died of a stroke in 1942 at the age of 64 years, the mother died in June 1938 at the age of 83 years, and the father died on February 16, 1942, at the age of 94 years.

The sister had two daughters, nieces of deceased and appellants here.

In 1942 deceased became considerably run-down and in poor health. His weight went from about 80 to 70 pounds. Because of his condition he entered the Blair Hospital in September of that year and remained there, being a patient for several months. He gradually recovered. In April 1943 he went to stay with his niece Margaret Vincent Pullen who lives in Des Moines, Iowa. He stayed there 3 or 4 months but because of her employment she was not able to take care of him. He then returned to Blair and again entered the hospital but not as a patient but only to make it his home as he apparently had no other place to live.

He stayed in the Blair Hospital and made it his home until he entered the Home on March 3, 1948. Prior to entering the Home he had, on January 6, 1948, made an application for a life membership. On his application he stated: "I will gladly give all I have to the Home. The Home is doing wonderful good for people that need care and I for one would give any amount I would have to help along the good cause." In this application he listed his property as a store building valued between $12,000 and $18,000, four shares of American Telephone and Telegraph Company stock, and $400 in cash. He sold the store building in March 1948 for $15,000.

The deceased, at this time, was apparently seeking the security of a permanent home for it appears he had made offers to others agreeing to give them everything he had if they would agree to provide him with a home for the rest of his life.

After he entered the Home deceased was on a two month trial or probation period to make sure he wanted to permanently live in the Home and to permit the Home to see if it wanted him. This is a rule of the Home applicable to all seeking to come into it as a life member. The Home also requires that every applicant for·

life membership have a complete physical check-up before his application can be acted upon by the board of trustees of the Home who have the final authority to either accept or reject the application. Dr. Charles M. Murphy of Omaha was employed by the Home for this purpose and gave deceased a complete physical examination on April 1, 1948. The examination disclosed that deceased's condition made his breathing more difficult and rapid than an ordinary person. It also disclosed that deceased had a condition affecting his heart but not of such a nature that it would be apt to cause death. Dr. Murphy reported the results of his examination to the Home and recommended that deceased be accepted. He did so because he thought deceased, given good care such as the Home provided, would probably live out a normal span of life for a man in his condition, although he recognized he probably could not withstand any serious pulmonary disease such as pneumonia. On May 12, 1948, the superintendent recommended to the board of trustees that the application of deceased be approved. This was done and on May 15, 1948, the contract was entered into.

That deceased was a pronounced hunchback with protruding chest and short of breath, especially when he exerted himself, and had a poor color was apparent to everyone who saw him. But this condition had existed for many years, if not all his life. He was 61 years of age when he entered the Home. His condition was apparently no different when he entered the Home than it had been while he was living in the hospital at Blair, except for the few months he was being treated by a doctor immediately following his entry therein in September 1942.

After deceased entered the Home he seemed to be satisfied with the arrangement and happy there. Nothing further happened of serious consequence until October 4, 1948, although some six or eight weeks prior thereto Dr. Murphy was called when deceased had a swelling of the ankles and had become very short of

breath. He was treated for those conditions and responded very well to the treatment given him. ·

On October 4, 1948, deceased had been around in the yard of the Home during the afternoon and had eaten his evening meal in the dining room. Shortly thereafter he became sick and Dr. Murphy was called. Dr. Murphy diagnosed the trouble as pneumonia and ordered that he be sent to a hospital. Deceased was taken to the Nebraska Methodist Hospital in Omaha. He entered there at 8:05 p. m. on October 4, 1948, having been taken there by ambulance. He died at 9:32 p. m of the same day. An autopsy was performed on his body by a pathologist. The pathologist gave as the cause of death a progressive heart condition that had been coming on for many years. It was Dr. Murphy's conclusion that death was due to pneumonia which probably affected his heart.

The uncertainty of the time during which the Home would continue performance of the contract was naturally within the contemplation of the parties and they must be presumed to have contracted with reference thereto. From the very nature of this type of contract some stand to financially gain while others will lose.

As stated in Walker v. Bales, 29 Tenn. App. 471, 197 S. W. 2d 401: "Because of the inherent nature of the agreement, involving, as it did, the uncertainty of life, the ordinary standard for testing the adequacy of the consideration to support a transfer of property cannot be applied in a case of this kind. The matter is not to be viewed with hindsight, but considered from the viewpoint of the parties at the time. Subsequent events, such as the early death of the person to be cared for, cannot be used to determine the fairness of the contract or the adequacy of the consideration. Considerable weight must be given the fact that the immediate parties were satisfied with the terms of the agreement. Dingler v. Ritzius, 42 Idaho 614, 247 P. 10, 49 A. L. R. 598, and note."

Taking into consideration all of the circumstances and

conditions existing at the time the parties negotiated the contract, we do not think it requires the Home to return to the deceased's estate any part of the consideration paid by him for his life membership in the Home.

Appellants further contend the Home terminated the contract when it took deceased to the Nebraska Methodist Hospital. It is true that the party's life membership contract has provisions providing for its termination by the Home under certain conditions but no such conditions here existed nor did the Home attempt to take such action.

The Home has some facilities for taking care of its members when they become sick and in its life membership contract agrees to provide to members the usual nursing and medical care which it has available. However, it has always been the practice of the Home, when its members become seriously ill, to take them to a hospital and then, when they have sufficiently recovered, to bring them back to the Home to convalesce. Facilities are available for this purpose. During this time the Home keeps the members' room available for their return. It was not the intention of the Home to terminate deceased's contract when it took him to the hospital because of his serious illness and merely taking him there for that purpose certainly did not have that effect as a matter of law.

We think what the court said in Wright v. Mary Galloway Home for Aged Women, 186 Miss. 197, 187 So. 752, is here applicable. Therein the court said: "The contention that Mrs. McClain's obligation to pay for her care in the Home did not arise because she did not continue as an inmate therein until her death is without merit. The Home, on account of serious heart trouble from which she was suffering, placed her in the John Gaston Hospital in Memphis to be treated therefor. She died after being there about three weeks. We think while there she was really still an inmate of the Home. If she had recovered, she would doubtless have returned."

Appellants further contend they are entitled to recover four shares of American Telephone and Telegraph Company stock because the Home failed to establish they were given to it by deceased during his lifetime.

"To make a valid and effective gift inter vivos, there must be an intention to transfer title to the property, as well as a delivery by the donor and an acceptance by the donee.

"It is generally held that the transfer inter vivos should be sustained if all the facts and circumstances show the desire and the act completed, whatever may have been the method adopted." In re Estate of Vanicek, 145 Neb. 531, 17 N. W. 2d 477.

Before discussing the merits of this contention we refer briefly to the fact that both parties discuss the question of whether or not certain testimony of Rollo V. Dull, superintendent of the Home, relating to this issue is admissible under the provisions of section 25-1202, R. R. S. 1943. The trial court sustained appellants' objections thereto and the Home has taken no cross-appeal from that ruling. In any event we think the evidence received without objection is sufficient to show the stock was a gift and therefore we do not find it necessary to decide the question.

The evidence shows the deceased made an assignment of this stock to the Home and sent it to the headquarters of the American Telephone and Telegraph Company. The company acknowledged receipt thereof and returned to deceased, by letter dated August 5, 1948, a new certificate for the four shares of stock issued in the name of the Home. This certificate of stock was turned over to the Home on August 9, 1948, and they acknowledged receipt thereof and have had possession of the stock certificate ever since. This assignment and transfer of the stock to the Home was in accordance with the terms of an agreement of August 13, 1948, entered into by the Home. This agreement provided that in consideration of deceased having given the Home the four shares of stock

that the Home would do certain things, all of which the record shows the Home has fully performed.

We find that deceased, during his lifetime, voluntarily gave the Home his four shares of stock in the American Telephone and Telegraph Company and that the Home is entitled to keep them.

In view of our findings we have come to the conclusion that the dismissal of the action by the trial court was correct and it is therefore affirmed.

AFFIRMED.