JOHN R. DOYLE, IN PERSON, AND FOR ALL PERSONS SIMILARLY SITUATED, APPELLEE, V. UNION INSURANCE COMPANY, A CORPORATION, ET AL., APPELLANTS.

277 N. W. 2d 36

Filed March 20, 1979. No. 41780.

600

Willkie Farr & Gallagher and Crosby, Guenzel, Davis, Kessner & Kuester, for appellants.

M. J. Bruckner, W. Scott Davis, and Michael McCormack, for appellee.

Heard before BOSLAUGH, MCCOWN, CLINTON, BRODKEY, and WHITE, JJ., and BLUE, District Judge, and KUNS, Retired District Judge.

CLINTON, J.

This is a class action by John R. Doyle, a policyholder of Union Insurance Company, a mutual company which dealt in property and casualty insurance, on behalf of himself and all other persons who were policyholders of the company on December 31, 1972. The action was commenced on March 16, 1973, in the District Court for Lancaster County against Union and the directors of Union to restrain the defendants from certain actions proposed to be taken on March 19, 1973, and praying for such other and additional relief as might be just and equitable. Equitable relief was denied and the action proceeded thereafter in February 1976, as a cause for damages on behalf of the policyholders, founded upon the premise that the directors had violated their fiduciary duties in "selling" the assets of Union to a newly created stock company for less than their real value.

On July 29, 1977, the court rendered judgment against certain of the defendants in the sum of $2,567,500 and the costs of the action. The cause as to other defendants was dismissed on motion for summary judgment.

The occasion for this action was a plan, since accomplished, originated by Maurice R. Gerleman and

William R. Berkley, a New York financier, to "sell" Union (hereinafter Old Union) to a new stock insurance company, hereinafter called New Union, substantially all of the shares of which would be owned by Houston General Insurance Company of Fort Worth, Texas, and Traders and General Insurance Company of Dallas, Texas. These two companies are wholly-owned subsidiaries of Finevest Services, Inc., a New York corporation of which Berkley is the principal owner and operator. The vehicle by which the sale was accomplished was the ceding of Old Union's business to New Union by a contract of bulk reinsurance under the provisions of section 44-224.05, R. R. S. 1943. The contract included provision for the purchase of the assets of Old Union by New Union and distribution to the policyholders of their equity in the surplus funds of Old Union. The plan was approved by the Director of Insurance of the State of Nebraska and a majority of the policyholders of Old Union.

The apparent theory upon which the case was tried was that the directors breached their fiduciary duties to the policyholders by: (1) Acting in their own interest or the interest of some of them; (2) selling the company for less than its fair value; and (3) failing to make complete and adequate disclosures to the policyholders in the proxy statements by which policyholders' approval of the terms of the contract were solicited.

The defendants-appellants make 26 assignments of error. The assignments fall into the following categories: (1) The court erred in not finding that the approval of the transaction by the Director of Insurance and his finding that the formula for distribution of policyholders' surplus was fair and equitable insulated the directors from any liability they might otherwise have. (2) The evidence does not support the findings of the court that the defendants were negligent or otherwise failed in their fiduciary du-

ties; and the defendants in any event can be liable only if grossly negligent, and the evidence does not support such a finding. (3) The court erred in admitting into evidence privileged communications between Maurice Gerleman and James Sedgwick, counsel for Gerleman and Old Union. (4) The court erred in not using a proper measure of damages, and the evidence does not support the amount of damages as found by the court. (5) The court erred in not determining that ratifying policyholders are not entitled to share in the judgment proceeds; therefore the amount of the judgment must in any event be reduced. (6) The court erred in not giving appellants credit for a $2,200,000 tax escrow account, which will be distributed to the policyholders in addition to the $8,300,000 dividend approved by the Director of Insurance if an income tax dispute with the Internal Revenue Service is resolved favorably to Old Union.

A shareholders' suit of this kind is an equitable action, which, except for the fact of dissolution of Old Union, would have been for the benefit of the corporation and not the shareholders. It is triable de novo in this court. Rettinger v. Pierpont, 145 Neb. 161, 15 N. W. 2d 393. However, when the evidence on material questions of fact is in irreconcilable conflict, we do, in determining the weight of the evidence, consider the fact that the trial court observed the witnesses and their manner of testifying and must have accepted one version of the facts rather than the other. The appellants assert that the court's findings were not based upon resolution of issues involving credibility of witnesses and therefore the trial court's findings are to be accorded no weight. A careful reading of the record shows that questions of credibility and weight are involved. Apparently the court considered a reference of some factual issues for determination by a jury which it has the discretionary power to do in equity cases.

§ 25-1105, R. R. S. 1943; Bank of Stockham v. Alter, 61 Neb. 359, 85 N. W. 300. However, all parties waived the proffered jury trial on such issues. We affirm.

Because of the size of the record, we must at times discuss the evidence in a conclusional way. We treat the assignments in the order in which we have listed them, amplifying the discussion as necessary to embrace the scope of the argument of the appellants.

## EFFECT OF THE APPROVAL OF THE DIRECTOR OF INSURANCE

Section 44-224.05, R. R. S. 1943, provides that any domestic insurance company operating other than on the stock plan may cede its business to another licensed insurer "by a contract of bulk reinsurance upon compliance with this section." The statute requires that the contract be first filed with and approved by the Director of Insurance and also approved by a majority of the stockholders. It provides that the Director of Insurance shall not approve the plan unless "he finds it to be fair and equitable to the policyholders of *each* insurer . . . ." (Emphasis supplied.) It further provides that the contract shall make provision "for distribution to each policyholder of the ceding company of his equity in the surplus funds, . . . as determined under a fair and equitable formula approved by the director."

Section 44-224.08, R. R. S. 1943, provides that all special meetings of policyholders called pursuant to section 44-224.05, R. R. S. 1943, shall be called upon a printed notice which must contain, among other things, (1) a brief statement of the substance of the bulk reinsurance contract and (2) a brief statement of the plan for distribution of surplus assets. The provisions of the statute, relating to approval by the Director of Insurance of the reinsurance agreement and the distribution of the surplus to policyholders,

contain no specific provision for notice to policy-holders. The only mention of notice is an indirect one by reference to section 44-2312, R. R. S. 1943, which provides that hearings in "contested cases" under Chapter 44 are governed by the provisions of sections 84-913 to 84-919, R. R. S. 1943, which are part of the Administrative Procedures Act. No one here contends that the application to the Director of Insurance and his approval was a contested case.

Section 44-224.05, R. R. S. 1943, demonstrates a legislative intent to protect policyholders. Before the Director of Insurance approves the plan he must find that it is fair and equitable to policyholders. Nowhere does this statute or the related statutes impliedly or expressly demonstrate an intent to abridge or limit the common law rights of policy-holders, who are, in the case of a mutual company, its owners. Rather, the statutes indicate that review and approval by the Director of Insurance is intended to be an initial screening process by means of which obviously inequitable arrangements may be avoided without the necessity of possible expensive and protracted litigation by policyholders. Neither does the language of the statute demonstrate any intention that mere approval by the Director of Insurance absolves (assuming that this is a legislative prerogative) the corporate directors from liability for violation of their fiduciary duties.

The statutes in question were first enacted in 1957. The applicable section does not appear to have been intended as a vehicle to determine disputes between corporate directors and policyholders. In Clark v. Lincoln Liberty Life Ins. Co., 139 Neb. 65, 296 N. W. 449, this court observed that under the then existing statutes which gave the department of trade and commerce the broad authority of "general supervision, control and regulation of insurance companies," the department had no power to make an initial adjudication to determine legal and equitable

controversies between insurance companies and their policyholders. Nothing in the present statute appears to change that principle.

The cases upon which the appellants rely are not on point. Ashurst v. Preferred Life Assur. Soc. of Montgomery, 282 Ala. 119, 209 So. 2d 403, did not involve a claim of breach of duty by corporate directors. That case involved the conversion of a fraternal company to a stock company. The policyholders at the time of conversion were to be issued stock. The transaction was not the "equivalent" of a sale as it did not constitute a change of ownership. In that case some policyholders wanted a dividend declared, and the court held there was no statutory right to a distribution of surplus.

Kueckelhan v. Federal Old Line Ins. Co., 74 Wash. 2d 304, 444 P. 2d 667, involved a "rehabilitation" of an insurance company because its investments failed to comply with statutory requirements. The insurance commissioner in that case was in effect authorized to act as a receiver, and the case is therefore not at all on point. Cotten v. Republic National Bank of Dallas, 395 S. W. 2d 930 (Tex. Civ. App., 1965), involved an action by a trustee in bankruptcy to have a loan made by a bank to the insurance company declared void. The issue was whether the bank knew the insurance company was insolvent when the loan was made. The court in that case held the lending bank was entitled to rely upon the presumption that the board of insurance commissioners had carried out its duty of making annual audits unless it had actual knowledge to the contrary. Casey v. Woodruff, 49 N. Y. S. 2d 625, and Otis & Co. v. Pennyslvania R. Co., 61 F. Supp. 905 (E. D. Pa., 1945), are, in fact, squarely contrary to the appellants' position. Trans World Airlines, Inc. v. Summa Corp., 374 A. 2d 5 (Del. Ch., 1977), involved federal statutes related to Civil Aeronautics Board approval of corporate transactions which, in

effect, preempted state law in certain limited transactions. The case is clearly distinguishable.

On the other hand, Rowen v. LeMars Mut. Ins. Co. of Iowa, 230 N. W. 2d 905 (Iowa), cited by the appellee, involves a situation and a holding which in principle are like those at hand. It was there argued by the corporate directors that the plaintiff policyholders had not exhausted their administrative remedies before the insurance commissioner. The Iowa Supreme Court held the doctrine of exhaustion of administrative remedies was inapplicable where the cause alleged "a series of torts by corporate insiders." The court said, in discussing the effect of the insurance commissioner's approval of the contract: "It is true he may disapprove a control transaction when he finds it is unfair or unreasonable to policyholders. Thus, as an incident of his powers he may provide a preventive administrative remedy for the wrongs alleged in this case. However, the statutory power to disapprove a control transaction is a limited power. It is not a legislative delegation to the insurance commissioner of jurisdiction over corporate insider torts, even though the commissioner is granted administrative authority to disapprove control transactions when such wrongs appear."

We hold that section 44-224.05, R. R. S. 1943, which authorizes the Director of Insurance of the State of Nebraska to approve or disapprove contracts of bulk reinsurance, by which a domestic insurance company operating on other than the stock plan may cede its business to another licensed insurer, and which statute requires that such contract of bulk reinsurance make a fair and equitable provision for distribution to policyholders of the ceding company of the equity in the surplus funds, does not abrogate the common law duties of corporate directors to policyholders of a mutual insurance company and that approval of the contract by the Director of In-

surance does not insulate the directors of the company from liability for violation of their fiduciary duties.

## BREACH OF FIDUCIARY DUTY

We first state some of the general principles defining the duties of corporate directors to the corporation and to its shareholders. Directors are fiduciaries or trustees and must comply with the applicable fiduciary duties in their dealings with the corporation and its shareholders. Davis v. Walker, 170 Neb. 891, 104 N. W. 2d 479. Where a director has acted in complete good faith and breached no fiduciary duties, then he is not liable for mere mistakes in judgment. Rettinger v. Pierpont, 145 Neb. 161, 15 N. W. 2d 393. However, a violation by a trustee of a duty required by law, whether willful, fraudulent, or neglect, is a breach of trust and the trustee is liable for any damages proximately caused by the breach. Rettinger v. Pierpont, *supra*; Johnson v. Radio Station WOW, 144 Neb. 406, 13 N. W. 2d 556. Where directors are empowered to sell all the assets of a corporation, they must act with at least that degree of care that ordinarily prudent men would exercise in their own affairs. Davis v. Walker, *supra*; Ashby v. Peters, 128 Neb. 338, 258 N. W. 639; Henn, Law of Corporations (2d Ed., 1970), § 234, p. 453. Directors should have a general knowledge of the manner in which the corporate business is conducted; and, where the duty of knowing exists, ignorance because of neglect of duty on the part of a director creates the same liability as actual knowledge and failure to act on that knowledge. Ashby v. Peters, *supra*. Directors may delegate their work to an executive committee, but they may not delegate their responsibilities, and they rely on the committee at their own risk. Ashby v. Peters, *supra*.

Clarity of later discussion makes it necessary to identify the individual defendants against whom judgment was rendered as well as certain other per-

sons. They are Maurice R. Gerleman, president and member of the board of directors of Old Union; E. E. Francis, chairman of the board; C. A. Gerleman, treasurer, member of the board, and wife of Maurice; Robert G. Walters, senior vice president, secretary, and member of the board; George Kimball, board member; and E. P. Francis, wife of E. E. Francis and board member. Those dismissed on motion for summary judgment from which no appeal was taken are John V. Head, board member, senior vice president, and general counsel; and James H. Ellis, board member. Oliver DeMars, another board member, resigned from the board on February 22, 1973, previous to the action of the board which gives rise to this cause.

The evidence would permit the trier of fact to find, either as uncontradicted facts or as reasonable inferences from the evidence, the facts and conclusions which follow. In July 1972, Gerleman and Berkley had a meeting in New York City. Shortly thereafter in August, pursuant to arrangement, the two held another meeting in Estes Park, Colorado. As a consequence of these meetings and later correspondence, a plan and understanding between the two men was reached. Under the terms of the understanding, a new stock insurance company would be organized under the laws of the State of Nebraska with a capital and surplus of $3,500,000 which was to be supplied by Berkley or organizations controlled by him. For the relatively nominal consideration of $25,000, Gerleman and key officers of Old Union would receive 20 percent ownership of the corporation as well as employment with New Union with substantial salary increases and other benefits. The major portion of the 20 percent would go to Gerleman.

After the initial contacts with Berkley, Gerleman made contact with another insurance company. Its proposition also included the acquisition by Gerle-

man of a 20 percent interest in the new company for a relatively nominal consideration.

In September 1972, Gerleman caused Old Union to pay to Berkley $25,000 for investment advisory services for a 1-year period beginning July 2, 1972. It is to be noted that this payment was for services which apparently had begun before the meeting between the two men and would continue to a time when, if the plan came to fruition, Old Union would no longer exist.

Gerleman began the negotiations and the implementation of the plan with little or no consultation and without approval of the board of directors of Old Union until December 21, 1972, when the board enacted a resolution authorizing management to take steps to "determine the feasibility" of affiliation with Finevest Services, Inc. No disclosure to board members of details of the affiliation was made at that time. In the latter part of September 1972, Berkley and Gerleman had consulted Nebraska counsel who began work on the legal aspects of the sale, including that of obtaining approval of the Director of Insurance of the State of Nebraska, with whom a first meeting was held on December 21, 1972. Implementation of the transaction was continued without further consultation with the board or its members (except as hereinafter noted) until formal approval of the transaction in final form was obtained on March 5, 1973.

In January 1973, counsel having been informed that Gerleman would get 20 percent of New Union for $25,000, advised Gerleman that a disclosure of this fact would have to be made to the Director of Insurance. Gerleman testified that as a consequence he abandoned that pursuit in January or February. In any event, no disclosure of this aspect of the negotiations was made to the Director of Insurance or to the board of directors.

At some time during the periods above mentioned,

Gerleman, at Berkley's suggestion, hired Touche Ross & Co., certified public accountants and accountants for Berkley, for the purpose of conducting an audit of Old Union to determine the policyholders' surplus. A figure of $8,300,000 was arrived at.

Sometime before February 21, 1973, there was a discussion between Gerleman, Berkley, Oliver De-Mars, and James Ellis in which the valuation of Old Union was discussed. Ellis was of the opinion that the company might be worth more than its "adjusted" book value. He recommended that a named eastern investment firm should be hired to conduct an independent appraisal. Following this discussion on February 21, DeMars resigned from the board because he was opposed to the proposal of Finevest Services, Inc.

On March 5, 1973, a majority of the board, including all those previously mentioned except the dissenters hereafter identified, acting wholly upon Gerleman's recommendation, approved the contract of bulk reinsurance which, apparently, up to that time none of them had seen or discussed. Mrs. Francis voted by a "proxy" given her husband. James Ellis voted against the proposal and later submitted a letter which pointed out that the directors were trustees for the policyholders and in which he stated: "To my knowledge there has been no attempt to (i) obtain an independent appraisal of the value of Union Fire, or (ii) seek or accept any other bid or offer from a proposed purchaser. There would undoubtedly be many larger and more experienced insurance companies or groups interested in Union Fire. The least that could be done to protect Union Fire policy holders would be to obtain an independent appraisal and ask for other proposals." Mr. Head also voted against the bulk reinsurance agreement and later submitted a letter giving the reason for his opposition. His objections related both to the

purported reasons for the sale (hereafter discussed) and the valuation of the property, and he suggested that certain specific items of value had not been considered. The reservations which these two men expressed concerning the transaction are borne out by independent evidence in the record.

Even before the meeting of March 5, 1973, notices of special meetings of policyholders, proxy statements, and proxies had been printed and were, within a few days after the meeting, in the mail to Old Union's more than 100,000 policyholders. On March 19, 1973, a very large majority of the policyholders voted in favor of the sale. On March 19, 1973, Finevest entered into an indemnity agreement with at least one of the directors, Mr. Francis, and did or offered to indemnify other directors. Indemnification was against policyholder action on account of the bulk reinsurance contract.

Mr. Gerleman made no attempt to determine whether the $8,300,000 policyholders' surplus determined by Touche Ross represented the selling value of Old Union. With the exceptions above indicated, the directors who approved the agreement made no efforts at all to inform themselves about it. The record leads to the conclusion they had not even read the contract when they voted on it.

We have by no means recited all the pertinent evidence on the issue now being discussed, but the record otherwise fully supports the conclusion that in this transaction, except for the dissenting directors, Gerleman was in effect a one-man board of directors and those approving the transaction were almost completely uninformed and acted wholly on his recommendation.

Although the trial court made no specific findings on this point, it could have well concluded that Gerleman in particular and Walters in a measure were acting in self-interest. At the time of trial, Gerleman was president of one of the two insurance

companies which owned the stock of New Union and Walters was president of New Union, both at much higher salaries and better side benefits than Old Union afforded. There is other evidence, relating to the terms of the contract, truth of the reasons purportedly justifying the sale, valuation of the business, and provisions of the proxy statement, which is pertinent to the issue here discussed. In order to avoid repetition, this evidence will be set forth in connection with the other assignments of error. The import of the portions pertinent to the present issue will be readily inferable without discussion.

In sum, the evidence clearly supports the conclusion that Gerleman acted in self-interest and was negligent and that the approving directors violated their fiduciary duties by negligence in that they failed to inform themselves in any appreciable degree on a matter of utmost importance to the policyholders.

## THE PRIVILEGED COMMUNICATION

Gerleman and Old Union objected to the introduction in evidence of certain written communications between James L. Sedgwick, attorney for Old Union, and Gerleman as president of Old Union, on the ground that they came within the attorney-client privilege. These communications were contained in letters dated January 3, 1973, and January 10, 1973, and were as follows: "P.S. If you and Bill have firmed up your understanding with regard to your 20% ownership of the new stock insurer for $25,000.00, I would appreciate it very much if you would include that information with the above." "5. If it is decided that you will get 20% of the new insurer for $25,000, we must advise the Director of this part of the plan, ahead of the filing or it might look like we are trying to hide something. Very frankly, this aspect scares me and I am firmly convinced will get an adverse reaction from Jackson. My reason is that it makes, on the surface, questionable the

stated reasons for pursuing this affiliation. Therefore, I suggest discussing the possibility of finding another manner of providing equity ownership.''

Section 27-503, R. R. S. 1943, provides in part as follows: ''(2) A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client (a) between himself or his representative and his lawyer or his lawyer's representative, . . . . (3) The privilege may be claimed by the client, . . . . The person who was the lawyer at the time of the communication may claim the privilege but only on behalf of the client. His authority to do so is presumed in the absence of evidence to the contrary. (4) There is no privilege under this rule: (a) If the services of the lawyer are sought or obtained to enable or aid anyone to commit or plan to commit what the client knew or reasonably should have known to be a . . . fraud . . . .''

An analysis of the facts shows quite clearly that Gerleman's proposed acquisition for nominal consideration of an equity interest in New Union would be fraudulent and a violation of his fiduciary duties. As president of Old Union, he had only a job and that ownership interest he may have had as a policyholder. Implementation of the plan would have given him for $25,000 an ownership interest worth $700,000—that is, 20 percent of the $3,500,000 capital and surplus of New Union. The fact that Berkley was willing to make such a concession is itself evidence from which a conclusion might be drawn that Berkley thought what he was getting was worth more than what he was paying. Otherwise, Berkley would have been unlikely to have been willing to make such an agreement with Gerleman. There is nothing in the record to show the dividend to shareholders was increased because of the ''abandon-

ment" of an agreement for equity ownership by Gerleman.

We hold, under the provisions of section 27-503, R. R. S. 1943, a communication between a lawyer and a client is not privileged if the services of the lawyer are sought or obtained to enable or aid anyone to commit or plan to commit what the client knew, or reasonably should have known, to be a fraud. See Garner v. Wolfinbarger, 430 F. 2d 1093 (5th Cir., 1970).

## EVIDENCE OF DAMAGES AND THEIR MEASURE

A trustee is required to dispose of trust property on the most advantageous terms which it is reasonably possible for him to secure for the benefit of those whom he represents. State ex rel. Ebke v. Board of Educational Lands and Funds, 154 Neb. 244, 47 N. W. 2d 520. The trial court found the measure of damages was the difference between the price for which the property was sold and its fair and reasonable market value at the time of the sale. This standard conforms with the statement of the court in State ex rel. Ebke v. Board of Educational Lands and Funds, *supra*, and with the general rule relating to damages in like cases. 90 C. J. S., Trusts, § 299, p. 465.

The pertinent portions of the bulk reinsurance contract are as follows. New Union does, by the agreement to reinsure, assume all the outstanding insurance contracts, etc., in force of Old Union. The effective date of the bulk reinsurance agreement is as of the close of business on December 31, 1972. Finevest Services, Inc. became the trustee for policyholders of the assets to be distributed to them. "14. The distributable surplus to policyholders of Union, the amount of the dividend, shall be computed and is hereby defined as follows: "(a) The surplus as regards policyholders as shown on the Annual Statement of Union filed with the Nebraska Department

of Insurance for the year ended December 31, 1972.

"(b) Plus the ceding commission to be received from New Union in an amount equal to the policyholders' equity in the unearned premium reserve shown on such Annual Statement; such equity to be determined by Union with the assistance of an independent certified public accountant and such figure to be submitted to the Director, Nebraska Department of Insurance. In the event the Director of the Nebraska Insurance Department disapproves said amount, then such equity shall be that as determined by the Director.

"(c) Plus the value of all non-admitted assets appraised at their fair market value as of December 31, 1972.

"(d) Plus or minus the difference between the value of all real estate shown on said Annual Statement and the appraised fair market value of said real estate. Said appraisal to be made by an unaffiliated, trained appraiser.

"(e) [P]lus or minus the difference between the December 31, 1972, book value and the market value of all bonds owned by the Company as shown by said Annual Statement.

"(f) Minus the amount of expenses incurred by Union as a direct result of this Bulk Reinsurance Agreement."

The controversy over valuation relates both to an overall valuation and to three specific items which the plaintiff claims were not considered or not properly valued in determining the price. All would, of course, affect the final amount of policyholders' surplus which, under the statutes, was required to be distributed.

We first mention briefly the matter of the specific items. No valuation was assigned to agency force—that is, the availability and loyalty of functioning independent agents who were selling policies for Old Union. The evidence supports the conclusion that

agency force did have a value and in fact was indispensible to the functioning of Old Union and New Union. The evidence shows considerable time and expense were incurred, with active participation by Berkley and Gerleman, in "selling" the "sale" to Old Union's more than 500 agents. In 1972, the agents produced for Old Union net premiums of $8,192,874.45. In that year Old Union had a net underwriting gain of $1,054,812.35.

An explanation of the other two specific items subject to dispute would require a more extended discussion than is necessary for the purposes of this opinion. The dispute essentially relates to the determination of the ceding commission which was to be paid and whether or not certain reserves were overstated and, on that account, the policyholders' surplus was undervalued, all of which would result in a windfall to New Union. A great deal of expert testimony focused on these items, but the question is ultimately one of valuation.

Finally, the parties presented evidence of an overall valuation founded upon conflicting premises.

One of the appellants' experts arrived at a valuation of $7,883,000 by averaging three figures representing various approaches, including Touche Ross' audited value of $8,300,000. This expert stated that his purpose was to "make an evaluation of the fairness of the dividend declared to Union policyholders." He did not value agency force because it, he said, is reflected in the premiums paid. This expert was employed by Berkley, and he acknowledged that in 1972 Old Union had a statutory underwriting income of $1,054,812, and that this was a very important factor to any investor.

The appellants' second expert was also employed to evaluate the fairness of the $8,300,000 dividend. It is clearly inferable from his testimony that his evaluation was founded upon an assumed situation where the mutual would be converted into a stock

company and the policyholders were going to be issued stock in the new company. That is not what was happening here, where the contract amounted to a sale with new owners taking over. It is also plainly inferable from his testimony that he was focusing on an assumed market for shares of individual shareholders and not the sale of an entire company. He arrived at a valuation of $6,600,000. This expert also was hired by Berkley.

One of the appellee's experts used a price earnings multiple and allowed for the fact that control of the corporation was being acquired. He arrived at a maximum valuation of $22,131,000 and a minimum valuation of $12,786,000, depending upon the earnings multiple used and what premium above market was assigned for acquisition of control. The appellee's other expert directed most of his testimony to a discussion and demonstration that the ceding commission was not properly computed and that the reserves previously mentioned were overstated and therefore policyholder surplus undervalued.

The appellants argue the testimony of an expert (presumably their own) cannot be arbitrarily disregarded and therefore the court erred in computing damages by its own method. The court determined valuation by multiplying an adjusted book value by 1.5. In so doing, it accepted some portions of the expert testimony and rejected others. This he was entitled to do under our law. Testimony of expert witnesses is not treated any differently in the fact-finding process than that of witnesses generally when it comes to determining the weight and credibility of the testimony. See, NJI No. 1.42; Brown v. Globe Laboratories, Inc., 165 Neb. 138, 84 N. W. 2d 151. The rule is not changed merely because the fact finder is the judge and not the jury.

The finding of damages by the court was within the range of the evidence, was not arbitrary, and, indeed, may have been conservative.

## EFFECT OF POLICYHOLDER APPROVAL
## OF THE BULK REINSURANCE CONTRACT

Did the vote of a majority of the policyholders approving the reinsurance contract ratify voidable acts of the directors and absolve them from liability?

The issue of whether stockholders may absolve corporate directors from liability for their actions is one upon which there is relatively little agreement. Some of the competing policies and interests involved are: (1) It should be possible for a majority of the stockholders to make an informed decision to stay out of court, and (2) litigation is not always the ideal solution to void or voidable behavior on the part of the directors; however, (3) dissenting stockholders have a property interest in the corporation, and our system has not favored the elimination of property interests by majority vote, (4) it is all too easy for directors to obtain sufficient proxies for ratification of what are often technical and complex ventures, and (5) the courts are not sympathetic to any sort of validation of violations of fiduciary duties. See generally Leavell, The Shareholders as Judges of Alleged Wrongs by Directors, 35 Tulane L. Rev. 331; Comment, Shareholder Validation of Directors' Frauds: The Non-Ratification Rule v. The Business Judgment Rule, 58 Northwestern L. Rev. 807.

The principle which governs under the facts in this case is that a ratification by shareholders (in this instance, policyholders) arises from their approving vote only when all the material facts are disclosed to them. Hudson v. American Founders Life Ins. Co. of Denver, 151 Colo. 54, 377 P. 2d 391. See, also, First Nat. Bank of Omaha v. East Omaha Box Co., 2 Neb. (Unoff.) 820, 90 N. W. 223; Henn, Law of Corporations (2d Ed., 1970), § 194, p. 379. When there has been a full disclosure, the courts of this country have adopted various positions as to what may be

ratified and in what manner. Here, however, we need not go beyond the principles and facts applicable to the case before us.

When we compare the information contained in the proxy statement with the facts earlier recited, we find there was clearly incomplete disclosure as well as deception. We list the following.

(1) The reasons for the sale as recited in the proxy statement were false and deceptive. It recited: "The Board of Directors . . . of Union have been concerned for some time about the Company's continued ability to achieve favorable results." It then recites reasons for the expressed concern, to wit, inability to attract and retain executive personnel, inability to compete viably with opposition insurance companies, and inability to get necessary additional capital because the mutual form of the company makes it impossible to sell stock and additional capital can come only by retention of earnings.

The above is contradicted by the following: The statement that the board of directors had been concerned for some time is simply not true. The "clouds on the horizon" were seen only by Gerleman. The board had made no investigation of any kind relative to future prospects. The claim of inability to attract executive personnel seems spurious, since it was contemplated from the beginning that the officers of Old Union would be the officers of New Union. In fact, the record establishes that Berkley offered Gerleman a 5-year contract at $50,000 a year. When the sale was consummated, the officers of Old Union became the officers of New Union.

The only evidence introduced on the question of ability to compete contradicts the pessimistic note of the forecast. As to ability to attract capital, it is true that because of the mutual form, Old Union could not sell additional shares. It is to be observed,

however, that New Union was to have capital and surplus of only $3,500,000 compared with the policyholders' statutory surplus in Old Union which, on December 31, 1972, was $7,994,280 and which represented an increase of almost a million dollars in 1 year.

The record establishes that Old Union was a healthy company, founded in 1886 and having a long history of profitability.

The stated reasons for the necessity of the "sale" are also undercut by the fact that, without any doubt whatever, the driving force behind the transaction was Gerleman and he was motivated by self-interest. The fact he was originally to acquire an equity interest in New Union never was disclosed to the policyholders. Had they been so informed, their views might have been quite different.

(2) The proxy statement says: "After numerous discussions and a great deal of investigation, the Board of Directors on December 21, 1972, authorized Management to seriously pursue a possible affiliation with Finevest Services, Inc." The fact is there was no investigation by the board of directors and the only discussion was the one which occurred at the meeting of December 21, 1972, which resulted in a resolution to investigate feasibility. Although the general outline of the plan had by then been well formed, no significant disclosure of the plan had been made to the directors.

(3) The proxy statement recites: "New Union would pay to Union a ceding commission equal to the Policyholders' equity in the unearned premium reserve as of December 31, 1972." Whether the ceding commission was fairly valued was the subject of a great deal of evidence. It was a matter to which the board gave no consideration whatever. The evidence rather clearly supports the conclusion there was enough additional equity in this item alone to account for the $700,000 ownership eq-

uity which Gerleman was to acquire.

(4) The proxy statement recites that from the dividend would be deducted "costs incurred in the preparation of the Bulk Reinsurance Agreement and the preparation and mailing of this proxy solicitation material. These costs are estimated to be less than $200,000.00." Any unused balance was to go to the shareholders.

The evidence shows that items other than those listed were paid and intended to be paid from that reserve. Some of them were, in fact, incurred or paid before the policyholders' meeting and even before the proxy statements were mailed. These include an undetermined portion of the fee of Touche Ross' audit, which portion was unnecessary to the sale but required to enable Finevest Services, Inc., to go public; traveling, housing, and other expenses of Finevest officers incurred during the "selling" of the plan to the agents; legal fees for the incorporation of New Union, which fees obviously should have been paid by owners of New Union; and legal fees of Willkie, Farr, and Gallagher for initial defense of this action. A credit-back adjustment of $13,000 to the $200,000 reserve was later made, but its nature is not shown.

(5) The proxy statement gives the impression the board approval was unanimous when it was not. The dissents of Ellis and Head are not noted and, of course, the reasons for their dissent are not declared.

We find that a complete disclosure of all material facts was not made to the shareholders and for that reason policyholder approval did not operate as a ratification under the particular facts of this case.

## CREDIT AGAINST JUDGMENT FOR TAX ESCROW ACCOUNT

The appellants' final contention is that they should be given credit against the judgment for that part of the tax escrow account for $2,200,000 which, after

final determination by the Internal Revenue Service, might be found not subject to claim for federal corporate income tax of Old Union.

The sources of the escrow account were the following three items: (1) $1,187,000 refunded by the Internal Revenue Service on account of income tax paid by Old Union for 1972 and prior years. The refund was made because of a deduction taken on the final return of Old Union for the period January 1, 1973, to March 1, 1973 (the time when it ceased to do business), consisting of the policyholders' dividend of $8,300,000 which it is claimed is deductible by reason of specific provision of the Internal Revenue Code relating to mutual insurance companies. The deduction resulted in a loss carryback for the years 1970, 1971, and 1972, hence the refund. (2) A deferred income tax reserve of $629,000 for the $1,250,000 ceding commission (deferred acquisition cost), paid to Old Union in 1973 and shown on its final return for the short period, but as to which it is claimed income tax was not payable because of the dividend deduction. (3) A $393,258 reserve for taxes because of a return to income from previous deductions in the Protection Against Loss account (a reserve for losses permitted by the Internal Revenue Code).

Whatever the merits of the tax arguments with the Internal Revenue Service, that part of the tax escrow account remaining after final settlement with the Internal Revenue Service was Old Union's property, having arisen either from a refund of past income tax, or reserves for taxes which were not in fact payable. Furthermore, the bulk reinsurance contract specifically provided that the amount remaining would be paid to the policyholders of Old Union. The argument of the appellants on this item is ludicrous and merits no further discussion.

Other assignments of error made by the appel-

lants have been considered and found to be unmeritorious.

AFFIRMED.

McCOWN, J., concurring in result.

I would restrict the holding as to the availability of the attorney-client privilege to the particular corporate context of this case and hold that where a corporation and its officers are charged with actions inimical to the interests of stockholders, the fiduciary obligations owed to stockholders are stronger than the policy favoring privileged communications, and that the facts in this case establish good cause for holding that the attorney-client privilege was not available here. See, Garner v. Wolfinbarger, 430 F. 2d 1093 (5th Cir., 1970), cert. den. 401 U. S. 974, 91 S. Ct. 1191, 28 L. Ed. 2d 323; In re Transocean Tender Offer Securities Litigation, 78 FRD 692 (N. D. Ill., 1978).

Although the language of section 27-503 (4) (a), R. R. S. 1943, is specific, nevertheless a holding that the lawyer-client privilege is not available in any case where the attorney's services are obtained in order to commit or plan to commit what the client knew to be fraud is far too broad.

KUNS, Retired District Judge, joins in this concurrence.