Michael S. MILROY, Plaintiff,

v.

John G. HANSON, John F. Hanson, Jerry D. Hanson, Jay Hanson, Defendants,

and

Sixth Street Food Stores, Inc., Nominal Defendant.

No. 4:CV94–3012.

United States District Court, D. Nebraska.

Sept. 29, 1995.

David R. Buntain, Cline, Williams, Wright, Johnson & Oldfather, Lincoln, NE, for plaintiff Milroy.

David D. Zwart, Baylor, Evnen, Curtiss, Grimit & Witt, Lincoln, NE, for defendants Hanson.

J. Scott Searl, Gerald P. Laughlin, Baird, Holm, McEachen, Pedersen, Hamann & Strashein, Omaha, NE, for defendant Sixth Street Food Stores, Inc.

## MEMORANDUM AND ORDER

KOPF, District Judge.

Equating evidence of oppression of a minority stockholder with fraud, United States Magistrate Judge David L. Piester concluded that Plaintiff had established the "fraud" exception to the attorney-client privilege. (Filing 163.) Accordingly, Judge Piester ordered the defendant corporation to produce records for Plaintiff that the judge found were otherwise protected by the attorney-client privilege.

Defendants have appealed. (Filings 166, 169.) Although Judge Piester's opinion is a thoughtful resolution of the matter, I shall reverse.

I find and conclude that Judge Piester erred by equating evidence of oppression of a minority stockholder with fraud for purposes of piercing the corporate attorney-client privilege. I also find and conclude that there was an inadequate "threshold showing" under *United States v. Zolin,* 491 U.S. 554, 570–72, 109 S.Ct. 2619, 2629–31, 105 L.Ed.2d 469 (1989). In particular, holding that "intentional misrepresentation" is the hallmark of "fraud," I find and conclude that Plaintiff failed to make a sufficient showing of "intentional misrepresentation."

## I.

This is a dispute between a dissident shareholder and director ("Milroy") of a closely held corporation ("Sixth Street"), and the remaining shareholders and directors ("Hanson defendants") who comprise the management of the corporation. *Milroy v. Hanson,* 875 F.Supp. 646, 647 (D.Neb.1995) (*Milroy I*).

Although previously alleging fraud as a specific count, Milroy, an attorney at a large Arizona law firm, amended his complaint by dropping the fraud claim as a specific count. (*Compare* Filing 1, Count One, denominated "Shareholder Oppression, Breach of Fiduciary Duty and Fraud," *with* Filing 29, Count One, denominated "Shareholder Oppression and Breach of Fiduciary Duty.")

Milroy has three remaining claims: (1) the Hanson defendants abused Sixth Street and violated their fiduciary duty by oppressing Milroy; (2) a derivative action alleging that the Hanson defendants have wasted the assets of Sixth Street; and (3) a civil RICO action alleging that the Hanson defendants have operated Sixth Street as an unlawful enterprise. *Milroy I,* 875 F.Supp. at 647.

In support of his lawsuit, Milroy sought various documents from Defendants. Defendants produced thousands of documents, but they refused to produce certain documents held either by Sixth Street's accountants or Sixth Street's counsel. The documents were withheld on the basis of the attorney-client privilege and the so-called work-product priv-

ilege. In support of its privilege claims, Sixth Street submitted privilege logs and affidavits describing in detail the nature of the documents and the basis for the privilege claim as to each document. (Filing 126.)

After Sixth Street refused to produce these documents, Milroy filed various motions to compel production. (Filings 74, 75, 108.) Sixth Street responded by seeking a protective order. (Filing 79.)

Judge Piester took up both motions, and, assuming the documents were privileged, concluded that Milroy constituted part of the "collective corporate client" and therefore the privilege could not be asserted against him. (Filing 128.) Defendants appealed, and I reversed. *Milroy I,* 875 F.Supp. at 652.

Among other things, I held that the privilege belonged to the corporation; that a dissident shareholder or director could not waive or otherwise frustrate the privilege over the objection of management; that the "good-cause" rationale for piercing the corporate attorney-client privilege had not been adopted in the Eighth Circuit; and that the rationale was not, in any event, applicable on the facts. *Id.* at 648–52. I remanded the matter to Judge Piester with instructions to determine whether the documents were privileged and, if so, whether the "so-called crime-fraud exception to the attorney-client privilege" applied. *Id.* at 650–51.

On remand, Judge Piester first determined that all the documents were covered by the attorney-client privilege. (Filing 163, at 13.) In so doing, Judge Piester determined that proposed Federal Rule of Evidence 503, although not adopted by Congress, was an accurate statement of federal common law and that federal common law applied. (Filing 163, at 3–4.) Neither party has appealed this determination.

Judge Piester then determined the meaning of the so-called "crime-fraud" exception. (Filing 163, at 29–48.) In so doing, he recognized that the "alleged improprieties here are clearly not 'crimes,' and have not been characterized in terms of 'fraud' as that term is ordinarily understood...." (Filing 163, at 29.) Milroy has not appealed this determination.

Nevertheless, Judge Piester "decline[d] to categorically exclude [the types of corporate wrongdoing claimed here] from the crime-fraud exception." (Filing 163, at 48.) Judge Piester then inquired whether Milroy had made a sufficient threshold showing to justify an *in camera* examination of the documents under *Zolin.* (Filing 163, at 49–52.) The primary [1] evidence considered by Judge Piester in determining whether he should review the documents *in camera* was a letter from a law professor to counsel for Milroy. (*Id.*)

The law professor reviewed various materials and gave the following opinion:

> I am of the opinion that each stockholder of Sixth Street Food Stores, Inc. owes a fiduciary duty to the other stockholders. This fiduciary duty is like the duty that each partner in a partnership owes to the other partners. The Hanson shareholders have deprived Mr. Milroy [*sic*] the opportunity to participate in the policy making of Sixth Street Food Stores, Inc. by passing resolutions to prohibit telephonic meetings of directors and by not electing him to its board of directors in 1993. The Hansons have deprived Mr. Milroy of all salary and dividends from the corporation after many years of significant payments being made to Mr. Milroy, while granting significant bonuses and salary increases to the Hansons. The Hansons have formed Hanson Holdings, Inc., which is wholly owned by two of the Hansons, and which has attempted to take business opportunities that normally would have been opportunities of Sixth Street Food Stores, Inc.
>
> In my opinion, these actions have not been taken with a view to the best interests of Sixth Street Food Stores, Inc. but rather to serve and benefit the individual interests of the Hanson shareholders and, therefore, constitute a breach of the fidu-

---

1. Judge Piester also considered the so-called Krendl and Krendl law firm letter to counsel for Sixth Street estimating the cost of a "freeze-out" or "squeeze-out" of Milroy. (Filing 163, at 50 & n. 18.) Defendants claimed this document was inadvertently produced and they requested the document be protected. Judge Piester concluded that Milroy had made a sufficient threshold showing without consideration of the Krendl document. (Filing 163, at 50–51 n. 19.)

ciary duty that the Hanson shareholders owe to Mr. Milroy and their actions as directors and majority shareholders are oppressive as that term is used in the Nebraska Business Corporation Act.

(Filing 149, tab 2, at 4–5 (Letter from Santoni to Plaintiff's counsel of 9/28/94).)

Relying primarily on the professor's opinion,[2] Judge Piester concluded that Milroy had made a sufficient "threshold showing" to justify the judge's examination of the privileged documents. (Filing 163, at 51) ("Santoni's assertions are sufficient to provide a reasonable person a 'good faith belief' that *in camera* review [was justified].")

After examining the documents, Judge Piester concluded that "a prudent person would have a reasonable basis to suspect the perpetration or attempted perpetration of a breach of fiduciary duty and/or shareholder oppression...." (Filing 163, at 61.) As a result, Judge Piester compelled production of the documents, holding that the "crime-fraud exception" overcame any attorney-client (or work-product) privilege claims. (Filing 163, at 68.)[3]

## II.

Since Judge Piester concluded there was no evidence of a "crime" justifying the piercing of the attorney-client privilege and no party appealed from that determination, the focus of this inquiry properly turns on the meaning of "fraud."

The broad question is whether evidence of oppression of a minority stockholder (and related breach of fiduciary duty) is properly equated with "fraud" insofar as the "fraud" exception to the attorney-client privilege is concerned. Once this question is answered, one can properly apply the correct understanding of "fraud" to the facts. I turn to those twin tasks now.

## A. The Meaning of "Fraud" as an Exception to the Attorney–Client Privilege

■ It has long been the rule, "accepted by all courts today," that the attorney-client privilege may be disregarded when the "client's communication to his attorney" is in "pursuit of a ... fraudulent act yet to be performed...." 2 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Evidence* ¶ 503(d)(1)[01], at 503–115 n. 1 (1992) (quoting *Securities & Exch. Comm'n v. Gulf & Western Indus., Inc.,* 518 F.Supp. 675, 680 (D.C.Cir.1981)).

Proposed Federal Rule of Evidence 503(d)(1) adopts this formulation. The proposed rule states that the privilege does not apply "[i]f the services of the lawyer were sought or obtained to enable or aid anyone to commit or plan to commit what the client knew or reasonably should have known to be a ... fraud." *Id.* at 503–1–503–2 (Rule 503(d)(1).)[4]

Despite the fact that it was not passed by Congress, proposed Rule 503 is followed by the courts of the Eighth Circuit. *Diversified Indus., Inc v. Meredith,* 572 F.2d 596, 605 n. 1 (8th Cir.1977). Moreover, precedent in this circuit provides that the "fraud" exception to the attorney-client privilege is a "narrow" one. *Charles Woods Television v. Capital Cities/ABC,* 869 F.2d 1155, 1161 (8th Cir.), *cert. denied,* 493 U.S. 848, 110 S.Ct. 145, 107 L.Ed.2d 104 (1989).

### 1.

■ The meaning of "fraud" as an exception to the attorney-client privilege is not as clear as it might seem. The word "fraud" could be given its ordinary meaning, that is, common-law civil fraud. J. Wigmore, *Wig-*

---

2. *See* note 1, *supra.*

3. In so doing, the judge declined to determine whether Defendants had "waived" the privilege as to the Krendl documents and a related billing statement. (Filing 163, at 67).

4. Nebraska's rule is "identical." *Id.,* ¶ 503[03], at 503–137 (citing Neb.Rev.Stat. § 27–503(4)(a) (Cum.Supp.1978)). Therefore, whether Nebraska law or federal law applies to the determina-

tion of this question is not dispositive as the "applicable state and federal principles are not materially different." *Pritchard–Keang Nam Corp. v. Jaworski,* 751 F.2d 277, 281 (8th Cir. 1984), *cert. dismissed,* 472 U.S. 1022, 105 S.Ct. 3491, 87 L.Ed.2d 625 (1985) (Since the applicable state and federal rules on the attorney-client privilege and the crime-fraud exception were the same, it was unnecessary to resolve the choice-of-law issue.).

*more on Evidence* § 2298, at 576–77 (McNaughton Rev.1961) ("[T]here is an inclination to mark the line at ... civil fraud."). On the other hand, "fraud" might mean any tort which involves some element of planning. *Id.* ("Yet it is difficult to see how ... the law can protect a deliberate plan to defy the law and oust another person of his rights, whatever the precise nature of those rights may be.").

As Judge Piester noted, certain text writers have favored an expansion of the exception beyond the plain meaning of the word "fraud." (Filing 163, at 30 (quoting 8 J. Wigmore, *Wigmore on Evidence* § 2298, at 576–77).) These text writers believe there is no reason to distinguish between "fraud" and other "wrongs" and "torts" for purposes of an exception to the attorney-client privilege, at least where there is some planning involved. (Filing 163, at 30–31 (citations omitted).) These writers argue that the difference between "fraud" and other torts and wrongs where planning is involved is only a matter of degree, and thus there is no reason to draw the line at such a "crude boundary." J. Wigmore, *Wigmore on Evidence* § 2298, at 577.

However, the view of these text writers that other wrongs and torts should be equated with fraud if some element of planning is involved was rejected by the drafters of Rule 503. As Judge Weinstein has pointed out, "[t]he exception in Standard 503(d)(1) is ... narrower ... in limiting the exception to communications in aid of crime or *fraud* rather than to communications in aid of crime or *tort.*" 2 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Evidence* ¶ 503(d)(1)[01], at 503–119 (emphasis in original). Thus, while Wigmore found this "a too

'crude boundary,' " the "Advisory Committee found the tort phraseology too broad considering the technical nature of some torts, particularly under federal law." *Id.* at 503–119–20.

As a consequence, when Rule 503 uses the word "fraud," I find and conclude that the word should be given its ordinary meaning of common-law civil fraud.[5]

### 2.

If the "tort phraseology is too broad," what then is the practical meaning of "fraud" for purposes of Rule 503? As noted above, when Wigmore spoke of "fraud" in the traditional sense, he meant civil or common-law fraud. J. Wigmore, *Wigmore on Evidence* § 2298 at 576–77. Since the drafters of Rule 503 followed the "traditional" "fraud formulation," 2 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Evidence* ¶ 503(d)(1)[01], at 503–119, it is necessary to distill the basic attribute of common-law fraud in order to apply the rule.

The essence of "common-law fraud" is "thought to include an element of intentional misrepresentation in order to profit from another." *West Va. Hous. Dev. Fund v. Sroka,* 415 F.Supp. 1107, 1114 (W.D.Pa.1976).[6] In other words, " '[f]raud' is an intentional and deliberate misrepresentation of the truth for the purpose of inducing another, in reliance on it, to part with a thing of value or to surrender a legal right." 1 Edward J. Devitt et al., *Federal Jury Practice and Instructions* § 16.08, at 583 (1992). *Accord Nebraska Jury Instructions Second,* NJI 9.01, at 571 (Rev.1994) (fraud as a tort). The Eighth Circuit has adopted this formulation for purposes of the "fraud" prong of the crime-fraud exception to the attorney-client privilege. *Pritchard–Keang Nam Corp. v. Jaworski,*

---

5. *Pfizer, Inc. v. Lord,* 456 F.2d 545, 548–52 (8th Cir.1972), does not suggest a different approach. Although the court in that case used the word "tort" in reference to the issue of when the corporate attorney-client privilege could be pierced, *id.* at 549, that discussion is preceded with a formulation of the question which confronted the court. In that formulation the circuit court recognized that the question was whether the moving party had made the *"prima facie* showings of *fraudulent or criminal activity* (emphasis added)...." *Id.* at 548. The court further reviewed and approved a finding that a

" 'fraud on the patent office' " had been shown. *Id.* at 549–51. Thus, both as to the written formulation of the question and the actual resolution of the issue, the *Pfizer* court focused on a "fraud" and not merely a "tort."

6. Nebraska has adopted this formulation. *Brown v. United States Nat'l Bank of Omaha,* 220 Neb. 684, 694, 371 N.W.2d 692, 699 (1985) (citing with approval *West Va. Hous. Dev. Fund v. Sroka* as authority for the material element of common-law fraud).

751 F.2d 277, 283 n. 6 (8th Cir.1984), *cert. dismissed,* 472 U.S. 1022, 105 S.Ct. 3491, 87 L.Ed.2d 625 (1985) (holding that crime-fraud exception had not been established and noting that an "indispensable element of fraud is that the complainant *had a right to rely on the misrepresentation* alleged") (emphasis added).

In summary, I find and conclude that the "fraud" exception to the attorney-client privilege found in Rule 503 requires a showing of "intentional misrepresentation" for the purpose of gain. In so stating, I do not impose the rigid formalism that concerned Judge Piester. (Filing 163, at 29.) That is, to make a "fraud" showing sufficient to abrogate the attorney-client privilege, a party need not specifically use the word "fraud" or even allege it in the pleadings or motions.

However, such a party must claim and prove that an actual or attempted "intentional misrepresentation" justifies abrogating the attorney-client privilege. Absent such a requirement, the word "fraud" in Rule 503 has little or no meaning save for that which a particular judge chooses to give it.

### B. Insufficient "Threshold Showing" of Fraud

Having concluded that "fraud" in Rule 503 means "intentional misrepresentation" and not some other ill-defined tort, it is now appropriate to determine whether Milroy has satisfied his burden.

Before Judge Piester was entitled to make an *in camera* examination of the privileged documents, he was required to find, without consideration of the privileged documents, that Milroy had made a factual showing sufficient to support a good-faith belief by a reasonable person that *in camera* review of the privileged materials "may reveal evidence to establish the claim that the [fraud] exception applies." *United States v. Zolin,* 491 U.S. at 571–73, 109 S.Ct. at 2630–31 (1989).

Judge Piester had before him two types of evidence "independent" of the privileged documents which convinced him that Milroy had satisfied the required threshold showing. The judge had the opinion of a law professor and a letter from one lawyer to another about costs.

It is critical to determine whether this evidence, considered collectively or separately, justified Judge Piester's review of the allegedly privileged documents. If this evidence was inadequate, then under *Zolin* Judge Piester should not have reviewed the privileged materials but instead denied Milroy's motions for failure to make such a showing. *Zolin,* 491 U.S. at 571–72, 109 S.Ct. at 2630–31 (requiring a preliminary showing before *in camera* examination is appropriate).

1.

The evidence that most persuaded Judge Piester that Milroy had satisfied the required threshold showing was the opinion of the law professor. (Filing 163, at 49–52.) However, a review of that opinion demonstrates that the law professor offered no testimony even remotely suggesting fraud.

Essentially, the professor opined that Defendants' "actions as directors and majority shareholders are *oppressive as that term is used in the Nebraska Business Corporation Act.*" (Filing 149, tab 2, at 4–5 (Letter from Santoni to Plaintiff's counsel of 9/28/94) (emphasis added).)

Under the Nebraska Business Corporation Act, "oppressive" is a statutory term different from the term "fraudulent," also used in the Act. Neb.Rev.Stat. § 21–2096 (Reissue 1991) provides for dissolution of a corporation upon suit by a minority shareholder when those in control abuse the minority in one or more of three ways. In so doing, the statute differentiates between acts which are "illegal," "oppressive," *or* "fraudulent." *Id.*

Given that Nebraska corporate law specifically differentiates between "illegal," "oppressive," or "fraudulent" conduct as a justification for dissolution, and given that the law professor specifically referred to Nebraska corporate law, the professor's exclusive reliance on "oppression," but not fraud, cannot fairly be considered to support Milroy's claim of fraud.

I do not wish to be misunderstood. "Oppression" may also involve "fraud,"[7] but this is not always, or even frequently, the case. Quite commonly, "oppression" of a minority stockholder is not predicated upon an intentional misrepresentation.

Indeed, the law professor's examples of "oppression" in this case evidence no fraud. Professor Santoni gave three examples of "oppression": (1) not electing Milroy to the board of directors and not holding directors' meetings by telephone; (2) stopping the payment of salaries and bonuses to Milroy, after many years of paying him a salary and bonus, while continuing such payments to others; and (3) forming a corporation to compete with or take business opportunities away from Sixth Street. (Filing 149, tab 2, at 3.)

None of these examples suggest that the "oppressive" conduct was based upon fraud. Specifically, there is no explicit or implicit claim by the professor that the course of conduct pursued by Defendants, even if otherwise "oppressive," was premised upon one or more intentional misrepresentations.

In sum, while Professor Santoni's considered opinion might be probative evidence of "oppression" under the Nebraska Business Corporation Act, it is not probative of "fraud" as that term is used in either Rule 503 or the Nebraska Business Corporation Act. Hence, Santoni's opinion failed to satisfy Milroy's burden to make a threshold showing under *Zolin*.

**2.**

Judge Piester also considered the so-called Krendl letter. (Filing 163, at 50–51 & nn. 18–19.) For the limited purpose of this opinion, I too shall consider this letter.[8]

The Krendl letter was from a consulting lawyer to Sixth Street's outside counsel. It outlined the costs of various prelitigation and litigation strategies for dealing with Milroy. (Filing 149, tab 4 (Letter from Krendl & Krendl to Burnell E. Steinmeyer, Jr., of 4/30/92).) Among the strategies for which costs were estimated were a "freeze-out" and a "squeeze-out,"[9] although those terms were not defined or discussed in detail.

There is nothing about the Krendl letter generally, or mention of the "freeze-out" and "squeeze-out" strategies specifically, which is probative of fraud. Indeed, without specific evidence of fraud, phrases like "freeze-out" and "squeeze-out" are meaningless for purposes of the fraud exception to the attorney-client privilege. *Ward v. Succession of Freeman*, 854 F.2d 780, 783, 789–90 (5th Cir. 1988), *cert. denied*, 490 U.S. 1065, 109 S.Ct. 2064, 104 L.Ed.2d 629 (1989) (Allegation that tender offers and reverse stock splits were attempts to "freeze-out" and "squeeze-out" minority stockholders was held insufficient to establish the crime-fraud exception to the attorney-client privilege inasmuch as tender

---

7. In *Doyle v. Union Ins. Co.*, 202 Neb. 599, 277 N.W.2d 36 (1979), there were both fraud and breach of a fiduciary duty. In that case, a corporate director made a favorable recommendation to other directors about the sale of the corporation in which he was involved. The director made this recommendation without disclosing that he had negotiated with the purchasers to obtain stock in the new corporation for nominal consideration. The director also failed to disclose that his attorney had advised him that he was required to disclose his interest to an insurance company regulator. The director further failed to disclose that, upon receipt of such advice, he abandoned his option to purchase so as to avoid public disclosure and scrutiny of the transaction. The Nebraska Supreme Court held that such a recommendation by the director without full disclosure was both fraudulent and a breach of the director's fiduciary duties. Judge Weinstein summarized the Nebraska Supreme Court's holding in *Doyle* this way: "[C]onse-

quently letters to attorney were not privileged which concerned acquiring an interest which would have been fraudulent *and* in violation of client's fiduciary duties." 2 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Evidence* ¶ 503[03], at 503–137 n. 26 (emphasis added). At the very heart of *Doyle* is a misrepresentation.

8. I believe Judge Piester should first have considered in detail under Federal Rule of Evidence 104(a) whether the letter was subject to the privilege, as Defendants claimed. *Zolin*, 491 U.S. at 573 & n. 11, 109 S.Ct. at 2631 & n. 11. If the letter was privileged, Judge Piester was not entitled to use it as part of the threshold showing under *Zolin*.

9. These terms were also used in a billing statement from another consulting law firm. (Filing 149, tab 5.) I have considered that billing statement also. It adds nothing to the Krendl letter.

offers and reverse stock splits are perfectly legal and proper.).

In summary, the Krendl letter is irrelevant for purposes of the fraud exception to the attorney-client privilege. The letter proves nothing about whether Defendants made or intended to make intentional misrepresentations to Milroy and used counsel in furtherance of that fraudulent purpose.

### 3.

I considered the law professor's opinion and the Krendl letter together. When viewed collectively, this evidence wholly fails to show fraud.

### C. Summary

I find and conclude that Judge Piester erred by equating evidence of oppression of a minority stockholder with fraud for purposes of piercing the corporate attorney-client privilege. Simply put, there was an insufficient "threshold showing" of "intentional misrepresentation" under *United States v. Zolin*, 491 U.S. at 570–72, 109 S.Ct. at 2629–31 (1989), and "intentional misrepresentation" is the hallmark of "fraud."

Accordingly,

IT IS ORDERED that:

(1) The appeals (Filings 166, 169) are sustained, and the order (Filing 163) is reversed;

(2) The motions for production (Filings 74, 75, 108) are denied;

(3) The motion for protective order (Filing 79) is referred to Magistrate Judge Piester for further consideration of whether the Krendl letter and the billing statement are protected by the attorney-client privilege or whether the privilege has been waived.